Filed 2/27/26  P. v. Ortega CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B325220 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA153495) |
| v. | |
| DANIEL ORTEGA et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Kelvin D. Filer, Judge.  Affirmed as modified.

John Steinberg, under appointment by the Court of Appeal, for Defendant and Appellant Daniel Ortega.

Alex Coolman and Cynthia Grimm, under appointment by the Court of Appeal, for Defendant and Appellant Alfonso Keer.

Derek K. Kowata, under appointment by the Court of Appeal, for Defendant and Appellant Jaime Chacon.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant

Attorney General, Noah P. Hill and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

* * * * * *

Daniel Ortega, Alfonso Keer, and Jaime Chacon (collectively defendants) appeal from a judgment following a jury trial. The jury convicted all three defendants of the murder of Raul Avalos and convicted Ortega of the murder of Jose Baca.[1] Each defendant received a sentence of life without the possibility of parole.

Defendants argue the trial court erred in denying their motion to sever counts eight and nine, relating to the murder of Baca, from the rest of the counts and by admitting the hearsay statement of Angelita Arreaga under the excited utterance exception to the hearsay rule. Ortega makes several claims of prosecutorial misconduct, and Keer argues the court erred in admitting statements made by Trevizu, a coparticipant in the Avalos murder, during a *Perkins* operation.[2] Keer and Chacon argue the trial court abused its discretion in denying their motion for new trial on the ground of newly discovered evidence regarding alleged misconduct by an investigating officer. Finally, Keer and Chacon ask that we review the trial court's *Pitchess* ruling for error.[3] We find no error concerning these issues.

---

[1] Jonathan Cruz, Rodrigo Trevizu, and Roy Sanchez were also charged as codefendants for their involvement in the murder of Raul Avalos but are not parties to this appeal.

[2] *Illinois v. Perkins* (1990) 496 U.S. 292 (*Perkins*).

[3] *Pitchess v. Superior Court* (1974) 11 Cal.3d 531 (*Pitchess*).

2

Defendants also raise sentencing errors. Keer and Chacon argue the trial court erred by imposing parole revocation restitution fines against them. The People agree. Chacon asserts he is entitled to an additional day of actual presentence custody credit because the court miscalculated the amount. The People agree. The matter will be remanded to the superior court for the limited purpose of correcting these sentencing errors. For the reasons set forth below, the judgment is otherwise affirmed.

## STATEMENT OF THE CASE

In a nine-count amended information, the Los Angeles County District Attorney's Office (the People or the prosecution) charged Ortega, Keer and Chacon in count one with conspiracy to commit murder (Pen. Code, § 182, subd. (a)(1)),[4] and in count two with the murder of Avalos (§ 187, subd. (a).)

The information charged Ortega in count three with the willful, deliberate, and premeditated attempted murder of Ana R. (§§ 187, subd. (a), 664), in counts five and nine with possession of a firearm by a felon (§ 29800, subd. (a)(1)); and in count eight with the murder of Baca (§ 187, subd. (a)).

As to counts one and two, a firearm special allegation under section 12022.53, subdivisions (b), (c), (d), and (e)(1) was alleged. As to count two, a section 190.2, subdivision (a)(10) special circumstance was alleged. As to count three, firearm special allegations under section 12022.53, subdivisions (b) and (e)(1) were alleged. As to count eight, a firearm special allegation under section 12022.53, subdivision (d) was alleged. As to count

---

[4]     All further undesignated statutory references are to the Penal Code.

3

eight, a section 190.2, subdivision (a)(3) special circumstance was alleged.

As to counts one, two, three, five, eight, and nine, the information alleged Ortega had been convicted of two serious and/or violent felonies under sections 667, subdivision (d) and 1170.12, subdivision (b). As to counts one, two, three, and eight, the information alleged Ortega had two prior convictions of a serious felony under section 667, subdivision (a)(1).

Ortega moved to bifurcate the trial on the prior conviction allegations against him. The motion was granted, and he waived a jury trial on the allegations. Ortega subsequently admitted the allegations.

On November 18, 2021, the jury trial of Ortega, Keer and Chacon commenced. On November 29, 2021, the People announced they would not seek the death penalty.

On January 24, 2022, the People moved to dismiss the gang allegations under section 1385. The court granted the motion.

On January 24, 2022, the jury commenced deliberations. On January 25, 2022, the jury returned the following verdicts:

In count one, all three defendants were found guilty of conspiracy to commit murder.

In count two, all three defendants were found guilty of the murder of Avalos. The jury found true the allegation that Ortega personally and intentionally discharged a firearm causing great bodily injury and death, and the special circumstance that Avalos was killed because he was a witness under section 190.2, subdivision (a)(10).

The jury acquitted Ortega of attempted murder in count three.

In counts five and nine, Ortega was found guilty of the unlawful possession of a firearm.

In count eight, Ortega was found guilty of the second degree murder of Baca.  The jury found true the allegation that he personally and intentionally discharged a firearm causing great bodily injury and death, and the multiple-murder special circumstance.

On June 20, 2022, Keer's *Pitchess* motion—joined by Chacon and Ortega—for discovery of police officer personnel records was granted.  The parties stipulated to be bound by the rulings in Cruz's *Pitchess* motion that was then pending in a different courtroom.

On September 13, 2022, following an in camera *Pitchess* review, the sealed list of discoverable material determined by Judge Guiterrez in Department Q was filed with the court.  The discoverable material was ordered to be disclosed to defendants.

On November 30, 2022, Ortega was sentenced in count two to a term of life imprisonment without the possibility of parole for the murder of Avalos, plus a consecutive term of 10 years for the firearm use enhancement.   Ortega was also sentenced in count eight to a term of life imprisonment without the possibility of parole for the murder of Baca, plus a consecutive term of 10 years for the firearm use enhancement.  In count one, Ortega was sentenced to a term of 25 years to life for conspiracy to commit murder, plus 10 years for the firearm use enhancement.  In counts five and nine, Ortega was sentenced to middle terms of two years for unlawful possession of a firearm, to be served concurrently with count two.

Ortega was ordered to pay $7,662 restitution to the victim compensation board, a $300 restitution fine, a $200 court

operations assessment, and a $150 criminal conviction assessment. Ortega received 1,121 actual days presentence custody credit.

Ortega filed a notice of appeal from the judgment on November 30, 2022.

On November 30, 2022, Keer was sentenced to life imprisonment without the possibility of parole for the murder of Avalos. On the same day, Keer filed a motion for new trial, which was joined by Ortega and Chacon. The motion was denied.

Keer was ordered to pay an $80 court operations assessment and $60 criminal conviction assessment. He was also ordered to pay a restitution fine of $300 and a "parole/postrelease community supervision/mandatory supervision restitution fine" in the amount of $300.

Keer filed a notice of appeal on December 27, 2022.

On November 30, 2022, Chacon was sentenced to life imprisonment without the possibility of parole as to count two, the murder of Avalos. Chacon's sentence as to count one was stayed pursuant to section 654. Chacon was ordered to make restitution to the victim in an amount to be determined at a restitution hearing and was given actual custody credit of 1,121 days.

Chacon filed a notice of appeal on November 30, 2022.

## FACTUAL BACKGROUND

**The murder of Avalos**

### *The relationships between the parties*

Sanchez was a member of the 40th Street gang, also known as Cuarentas, and his moniker was "Dipz."[5] Sanchez's brother-in-law introduced him to Avalos, and Avalos introduced Sanchez to Candido Ramirez for the purpose of purchasing methamphetamine.[6] Ramirez and Avalos were close friends and lived together at Ramirez's house, which was located in the 900 block of East 87th Place in Los Angeles. Sanchez and Ramirez became friends, and in March or April 2019, Sanchez also moved into Ramirez's house. Sanchez eventually began selling drugs from Ramirez's home. Sanchez and Avalos also did construction work with Ramirez. However, at some point, Sanchez stopped showing up for the construction work and began hanging out with defendants.

Sanchez joined the Cuarentas gang when he was 18 years old, because he looked up to one of its members, Keer, whose moniker was "Oso." Keer sold drugs and employed others to sell drugs for him, including Sanchez. Chacon was a Cuarentas member with the moniker "Terco," whom Sanchez also knew.

---

[5] On September 27, 2021, Sanchez was interviewed by the district attorney's office after he sent word through his attorney that he wanted to cooperate. In exchange for his cooperation, he was offered a sentence of 15 years in state prison if he pleaded no contest to second degree attempted murder. Sanchez accepted the proposal.

[6] Ramirez was given immunity for any charges related to the illegal sale of narcotics in exchange for his testimony.

7

Sanchez knew Ortega, a member of Southside Watts, with the moniker "Troubles." Ortega also sold drugs for Keer.

Ortega introduced Sanchez to Cruz, a member of the Wynos clique of the Southside Watts gang, who used the moniker "Scrappy." Sanchez also knew Cruz's brother, Trevizu, whose moniker was "Dopey."

Sanchez's relationship with Keer broke down in 2008, resulting in the two not seeing each other for six or seven years. During that time Sanchez met Avalos and Ramirez and moved in with them.

In 2019, Sanchez ran into "Dice," a gang member who was a friend of Keer. Dice took Sanchez to see Keer, and Sanchez and Keer renewed their relationship. Sanchez began selling drugs for Keer out of Ramirez's house. Keer gave Sanchez a Nissan Sentra to drive and helped him find construction jobs. At the time, Sanchez was using methamphetamine.

Sanchez sold methamphetamine given to him by Keer to Avalos, although Avalos did not yet have the money to pay. Sanchez gave Avalos some time to get the money, but Keer wanted to be paid right away. Ortega, Keer and Chacon showed up at Ramirez's house and demanded the drugs back or the money from Avalos and Ramirez, who did not have the money, nor all the methamphetamine. They did return the methamphetamine they had left. Chacon told Ramirez they would have to start paying taxes.[7]

---

[7] Ramirez denied ever being told he had to pay taxes or that he had been threatened regarding the outstanding methamphetamine debt. Sanchez testified to Chacon's demand for taxes.

Approximately two weeks later, Keer asked Sanchez, "are they gonna pay me or what[?]" Sanchez responded, "they haven't mentioned it." Keer told Sanchez, "I'm gonna need you to take care of that." Sanchez interpreted this remark to mean he needed to get Avalos to pay up, move out, or to kill him. The amount of unpaid money for the methamphetamine was about $400.

### The July 2, 2019 shooting of Avalos

Cell phone records for the evening of July 1, 2019, and the late afternoon and evening of July 2, 2019, indicate communications among Sanchez, Keer, and Chacon. Later in the evening of July 2, 2019, Dice arrived at Ramirez's house to see Sanchez, who had not seen Dice for a few months. Sanchez knew Dice was "there for business." Dice asked Sanchez, "Are you with us or are you with them?" Dice showed Sanchez he was armed with a gun, and Sanchez said, "I'm with two guys." Having seen the gun, Sanchez panicked and texted Ramirez, "Come out . . . they trying to rob you." One minute later, he texted Ramirez to come out immediately. Ramirez did not see the texts at the time.

Sanchez and Dice used methamphetamine that night. At some point, Sanchez took out his gun, a .357 that belonged to Keer.[8] Eventually Dice said to Sanchez, "let's go to the back." When Sanchez and Dice went to the back of the house, they saw Avalos. Dice asked Sanchez, "so you gonna do him or what?" Sanchez replied, "Yeah." He walked towards Avalos and said "hey." Avalos turned around, and Sanchez shot him in the arm.

---

[8] Keer would store guns at Chacon's house. The guns were passed around among gang members.

Avalos started running. Sanchez shot two or three more times, but Avalos kept running. Sanchez ran off the other way.

Sanchez kept running until he came to the home of Ramiro "Roly" Valencia. He told Valencia what happened and asked Valencia to call Keer to come and get him. Valencia gave Sanchez a change of clothes. Sanchez changed and left his old clothes and the .357 revolver with Valencia, who gave the gun to Keer when he arrived to pick up Sanchez. Keer later told Sanchez he broke the gun down into pieces and threw them in different trash cans.

Ramirez, who had been asleep during the shooting, woke up to Avalos banging on his door. When Ramirez opened the door Avalos said Sanchez shot him.

Los Angeles Police Department (LAPD) Officer Robert Martinez responded to Ramirez's house to investigate. Ramirez told Officer Martinez that Sanchez rented the space in the back and had shot Avalos with a revolver. Ramirez said he thought Sanchez was with a man named Dice. The police asked Ramirez for help moving a Nissan Sentra, later identified as belonging to Keer, so it could be impounded. Ramirez cooperated. Avalos also identified Sanchez as the shooter.

The next day, LAPD Detectives Jennifer Carson and Isaac Fernandez went to Ramirez's house to interview Avalos, who recounted the events of July 2, 2019. Avalos indicated Sanchez had been outside and drunk. When Avalos was walking to his car to go get something to eat, he turned around and saw Sanchez heading toward him. Sanchez shot him. Avalos believed Sanchez was aiming at his face. Avalos thought Sanchez fired six or seven shots. He ran inside the house after he was struck by gunfire. Avalos identified Sanchez as a member of the Florencia

10

gang. At the time of the shooting, Sanchez was with a friend and fellow gang member. Avalos had no idea what Sanchez's motive was for shooting him. He found Sanchez to be paranoid at times, but he never had any problems with Sanchez. The detectives showed Avalos photos, from which Avalos identified Sanchez.

### *Events following the July 2, 2019 shooting of Avalos and Sanchez's arrest*

On July 3, 2019, Ramirez texted Sanchez, "u fucked up because he will be okay" and "u just flipped ur life around." Sanchez did not see the texts until the following day, when Chacon and Ortega went to pick up his belongings, including his phone, which he had left at Ramirez's house.

On July 11, 2019, Sanchez texted Ramirez, "Ima need the car back. I had 'til the 20th paid to have my stuff there. There is no reason why that car was pushed out and how did you get it out . . . without the key. That car belonged to someone else. U [k]new that. Now he wants it back by any means." Ramirez responded the car had been impounded or taken by the police, and Sanchez texted him, "so who picked it up so I can call them." Ramirez responded by text, "you messed up." By text message Ramirez informed Sanchez that his friends had picked up his things and he had moved the car so the police could take it. Ramirez also told Sanchez, "I was your friend. I never would have hurt you. Good luck . . . ." Sanchez replied by text, "I didn't do shit. You simply kicked me out . . . ." He also asked if Ramirez told police that he shot Avalos. Ramirez replied, "No one kicked you out. You did this to yourself."

Sanchez continued texting Ramirez about moving the car and told Ramirez he would have to deal with Keer. He blamed Ramirez for calling the cops, and Ramirez replied, "when

11

someone gets shot the cops have to get involved stupid." Sanchez texted, "Who got shot?," to pretend as if he had not shot anyone. The exchange ended with Sanchez apologizing for "everything."

On July 15, 2019, Sanchez went to see Ramirez and Avalos so he could apologize to them. Ramirez came out with a rifle, told him to leave and that he called the police. They talked for a couple of minutes before the police arrived and arrested Sanchez.

On July 16, 2019, Sanchez called Keer from jail, saying he had been arrested and would be going to court the next day. Sanchez also told Keer the police got their information about the shooting from someone he used to live with. Cell phone records indicate that following the call, Keer communicated with Ortega and Chacon.

On the same date Sanchez called Ramirez from jail. Sanchez asked Ramirez to change his story to say he made a mistake, it was not Sanchez who shot Avalos.

### *The murder of Avalos*

Social media records linked the parties and their gang monikers. Keer had a relationship with Esmerelda Renteria, Sanchez, and Ortega. Chacon's social media showed relationships with Sanchez and Keer. Records for Ortega showed conversations with Cruz, Renteria, and Trevizu. Records for Trevizu linked him with his gang and Cruz, as well as Sarai Barba. Records for Sanchez showed his relationships with Keer, Ortega, and Renteria.

Within Ortega's records were conversations about whether or not Sanchez would be in court after his arrest for shooting Avalos. The discussions took place on July 15, 2019, between Ortega and Cruz. The two also discussed needing firearms. Conversations on July 17, 2019, indicated Ortega was at

12

Sanchez's arraignment, where he was "making sure nobody shows up to snitch."

Ortega communicated with Trevizu after Sanchez's arraignment. Trevizu asked for Keer's phone number. Ortega responded that he was at Keer's house, and Keer was sleeping. Trevizu provided Ortega with a phone number and asked Ortega to have Keer call him.

On the morning of July 20, 2019, before Avalos was murdered, Ortega communicated with Cruz, who was then with Trevizu. Cruz asked if Ortega was close by because he needed a gun and a phone. Ortega told Cruz he was not nearby, but "we gonna have to do that for [Sanchez]. Then you can have the [gun]. Just don't lose it." Ortega said he had a government phone, and Cruz asked, "When you wanna do this?" Ortega replied, "I was hoping this morning." They coordinated when they would meet and get the guns, which were in Compton where Chacon lived.

Ortega next communicated with Trevizu. He told Trevizu he was on his way. Trevizu asked where they would meet, and if they should go to Keer. Ortega responded, "No. I'm coming to you." Trevizu's records showed he communicated with Barba just before the murder.

Keer also communicated with Ortega and Chacon leading up to Avalos's murder.

Renteria was introduced to Chacon by her friends Keer and Ortega. On July 19, 2019, Ortega took her to a nightclub and drove her home in her dark blue GMC Envoy. At 2:00 a.m., on July 20, 2019, she let Ortega borrow the car.

Barba was Trevizu's girlfriend. Trevizu, his brother Cruz, and Cruz's family were staying at Barba's home on July 20, 2019.

In the early morning of July 20, 2019, Cruz convinced Trevizu to give him a ride. Trevizu, Barba, and Cruz all left in Barba's gray Nissan Armada. Trevizu was driving, and they met up with Ortega, who was alone in the Envoy. Trevizu parked the Armada, and he, Barba, and Cruz got into the Envoy with Ortega.

Ortega drove them to a house with a black metal gate in front. Ortega whistled, and Chacon opened the gate. Ortega drove the Envoy past the gate, stopped the car, and he and Cruz got out. They then got back in the car and Chacon followed them in a gold Mercedes to a gas station. They drove back to the Armada, where Barba got out because the others told her she might be in danger due to driving into rival gang territory. Barba stayed with her Armada, and the others left.

Detective Fernandez reviewed surveillance video captured around the time of Avalos's murder that showed a dark colored GMC Envoy and a gold Mercedes. The driver of the Envoy appeared to be wearing a bright orange shirt. Both vehicles turned onto the street where Avalos lived. Detective Fernandez saw two individuals wearing dark clothes stepping away from the stopped Envoy and walking towards Avalos's residence. Thereafter, the gold Mercedes appeared. Eventually the two men in dark clothes ran back and got into the Mercedes, which drove south while the Envoy drove north. It appeared that one man was on the phone. The cars later met up and were joined by a third vehicle, a Nissan Armada. The three vehicles stopped, and three individuals exited the Envoy. Two of them got into the Armada, and one of the passengers from the Envoy jumped into the driver's seat. The Mercedes and Envoy then went in one direction, and the Armada went in the other direction.

14

Detective Fernandez later learned Renteria owned the Envoy. The vehicle was impounded in November 2019. The Mercedes belonged to Chacon and was located at Chacon's residence. The Armada belonged to Barba and was registered to her mother.

Cell phone records revealed at approximately 9:57 a.m. on July 20, 2019, Ortega called Trevizu. A few seconds later, Trevizu called Barba. Next, Trevizu conferenced Ortega into the call with Barba. The call among the three lasted approximately 10 minutes. Additional records placed Ortega's and Trevizu's phones in the vicinity of the murder at the time it occurred.

Ramirez, Avalos, and Ana R. were at Ramirez's house before the murder. Ramirez left for work at 9:40 a.m. Ana R. said Ramirez tried to convince her to come to work with him that day, but she stayed behind at the house.

Ana R. went to her car to unload paint, and "two young men came in that . . . were dressed in black." Both men had guns. Ana R. stopped what she was doing and followed the two men. The two men started shooting into Avalos's room while Avalos was on the bed. Ana R. yelled to Avalos, who ran to the bathroom, followed by the men. Avalos shut the door, but one of the two men knocked it down. The other pointed a gun at Ana R. One man shot and killed Avalos, who sustained a total of seven gunshot wounds. The other tried to shoot Ana R., but he was out of ammunition. The two men then left.

LAPD Officer Andres Sandoval responded to Ramirez's house after the shooting. When he arrived, Ana R. directed him to the rear unit where he entered and saw Avalos with a gunshot wound to the head. There was a bullet casing, cell phone, and drug paraphernalia in the room. The police determined they

15

were looking for a gold Mercedes. Ana R. informed the officers she was aware Ramirez sold drugs at the house and explained Avalos was shot because he was not paying taxes to sell drugs in that area.

The police recovered seven 9-millimeter bullet casings, some in the bathroom and some not.

Ramirez arrived home at 3:00 p.m. and was informed by police Avalos had been killed. Ana R. was scared and didn't know who she could trust. Ramirez offered her $10,000 to tell him who the shooters were, but Ana claimed to not be certain of their identities.

At the time of the shooting Trevizu called Barba, who was waiting in her Armada. During the call, she heard gunshots and screaming. When Barba asked what was going on, Trevizu said something about a shooting. Trevizu said he was coming to get her and instructed her to follow him when he arrived. Trevizu arrived in the Envoy while he was still on the phone with Barba. She tried to follow him, but he was driving so fast that she lost him. He then gave her instructions how to find him. Once she drove to meet the Envoy and the Mercedes, Barba moved into the Armada's passenger seat. Trevizu got into the driver's seat, and Cruz got in the rear passenger seat and they drove away.

### *Events following Avalos's murder*

On July 20, 2019, at 1:00 p.m., Renteria sent a text message to Ortega and told him she wanted her car returned. Between 2:00 p.m. and 3:00 p.m., Ortega and Keer arrived in Keer's red Chevy Avalanche truck. They drove Renteria to some place in Compton or Long Beach, where Ortega pulled her Envoy out from behind a black gate. Renteria got in her car and drove home.

On July 21, 2019, Ortega sent a message to someone named Cody Westbrook and asked, "What's the word?" Westbrook replied he was waiting for some individuals to give him money. Westbrook asked Ortega if he needed money, and Ortega responded, "Can't say much. I have to bust a ghost."

On July 22, 2019, Ortega sent a message to someone that read, "Say 'yes' before I go turn myself in." The individual replied, "Make sure you delete our text." Ortega also messaged, "If I keep running, I'm getting the death penalty. But if I turn myself in, I'm good." In another message using Instagram, Ortega wrote, "I'm [in] desperate need of help. I'm on the run." He continued to say he needed somewhere to hide and could not call Keer because he brought attention to Keer's house. Ortega sent additional messages regarding needing somewhere to hide.

On July 31, 2019, Ortega sent a message to Renteria asking her when Sanchez had his next court date. Renteria responded with a screenshot of Sanchez's inmate information, adding Sanchez's next court date was August 15, 2019.

**The death of Baca**

Baca was killed on September 15, 2019, outside of El Latino Alegre nightclub. His body was found nearby at the corner of Beach Street and Firestone Boulevard.

Security cameras recorded Ortega entering the nightclub at 9:55 p.m. and Keer entering shortly thereafter. The camera also captured Baca and Chacon at the nightclub, including the view of Chacon walking to Ortega and greeting him. Keer then greeted Chacon. Witness Arreaga was seen speaking to Chacon.

Security cameras showed Baca dancing with a woman when Ortega walked past Baca, towards the bathroom. Ortega then returned to where he was with Keer and Chacon. Keer

17

appeared to say something to Chacon, and then Chacon and Ortega followed Keer out of the nightclub.

At 11:40 p.m., Baca left the nightclub. Baca approached Ortega in the parking lot, and a few moments later, Arreaga left the nightclub. Arreaga then returned to the inside of the nightclub and spoke with Keer, who had reentered and was dancing. Keer then left and reentered the nightclub multiple times and continued dancing.

Ruby Rojas was inside a Chevy Astro van, parked in front of the nightclub at the time of the shooting. At 11:50 p.m., she saw two men in a verbal altercation. One, later identified as Ortega, was thin and short, with a bald head and lots of tattoos. The other man, later identified as Baca, was tall and slightly chubby. Baca had followed Ortega out of the club. Baca asked Ortega for a cigarette, and an argument ensued. Ortega went to a red Chevy Avalanche, parked nearby, retrieved a gun from the front passenger side, and shot Baca. Ortega then "took off running." Following the shooting, Rojas spoke with detectives. From photographs, she identified Ortega as the shooter. Baca died as a result of the gunshots.

Arreaga testified she was working as a server at the nightclub that evening. She went outside and saw some people fighting in the parking lot. She then returned and told Keer, whom she knew, about the fighting.[9]

---

[9] Arreaga stated she was afraid to come to testify in court against "those who killed the young man." She was "scared of those Cholos because [she] kn[ew] how they work." She stopped working at the nightclub after the shooting because she "didn't want them to go after [her.]"

18

Zulma Orellana was also working at the nightclub when the shooting occurred.  She knew Keer and danced with him that evening.  While they were dancing, Arreaga approached them and asked Keer, "How can you let your young men go around with guns[?]  She said he's going to go and get one . . . and he's going to kill another guy."  After the shooting, Keer asked Orellana to dance again.  He asked for her phone number and told her, "the police are going to come," "just act normal," and "nothing happened here."  Keer asked her where the cameras were located in the nightclub, and she showed him.  He was nervous because police were watching the recordings.

LAPD Detective Noelle Judge interviewed Orellana after the shooting in an undercover police car because Orellana was scared she would be identified.  Orellana was "very stressed and . . . very timid."  Orellana identified Keer as the man she had been dancing with before the shooting and mentioned a man, believed to have been the killer, with him.  She referred to Keer as the boss of the killer.

David Moreno Garcia was working as a DJ at the nightclub at the time of the shooting.  Before it occurred, someone in the club yelled, "they're fighting."  Garcia went outside and heard an individual say, "someone's armed."  Garcia saw the gunman holding the gun and saw the other man launch himself at the gunman.  He then heard and saw a gunshot.  The gunman fled afterward.

**Police investigation of the Baca shooting**

Los Angeles County Sheriff's Department Detective Gordon Lukehart investigated the murder of Baca.  When he arrived at the nightclub, he saw the Astro van and the Avalanche that was registered to Keer.  Detective Lukehart also saw graffiti in the

19

area belonging to the Southside Watts gang. In a nearby alley there was a blood trail and nine-millimeter cartridge casings.

Detective Lukehart reviewed Ortega's social media records, including a September 19, 2019 discussion between Ortega and Rick Esquivel. Ortega messaged Esquivel, "so tell me who just got smoked on Beach Firestone." Esquivel replied, "I don't know." Ortega asked, "do you know if he was from a hood or a tagger," to which Esquivel responded he did not know. Ortega then confessed, "cuz I'm the one who did that."

On October 3, 2019, sheriff's deputies recovered a nine-millimeter handgun from Jose Bobadilla, who was known as "Tiny." It was determined to be the gun used to kill Baca.

Detective Lukehart reviewed text messages on Ortega's phone, including those between Ortega and someone named Kane beginning on October 4, 2019. Ortega messaged Kane, "So I guess all the little homies are going to burn me for my heats. First Scrappy and now Tiny and Kane supposedly list my last nine to the cops . . . ."[10] The next message from Ortega read, "How the fuck am I going to look asking them to supply me when I had three 9's, two 357's and now I'm stuck with a fucking shotgun . . . ."

**Events following defendants' arrests**

### *Attack on Sanchez in jail*

While Sanchez was in custody, Ortega admitted to him he killed Avalos.

Also while in custody, Sanchez feigned a mental health issue in order to get out of the general population, where he owed a debt for drugs he could not pay. Although he was removed from

---

[10]     Ortega was referring to a gun.

the general population, he was attacked on September 8, 2020, while being held with Keer, Chacon, and Cruz at court. He reported not knowing who hit him, and was taken to the hospital for treatment of his wounds.

On the day of the attack, Deputy Fernando Carrillo was working as a bailiff, and Sanchez's attorney requested to speak with Sanchez. Deputy Carrillo located Sanchez, who had blood on his shirt and a laceration to the back of his head. Deputy Carrillo asked Sanchez what happened, and Sanchez replied he had fallen and hit the back of his head. After speaking with Sanchez, Deputy Carrillo spoke with Keer and Chacon among others in the holding cell. None of the men provided any explanation as to how Sanchez was injured.

Deputy Francisco Padilla was also working as a bailiff at the time and investigated the attack of Sanchez. He attempted to photograph the hands of the individuals who were in the cell with Sanchez but was denied access. They refused to talk to him and turned their backs.

### Police interviews following defendants' arrests

#### Trevizu

Following Trevizu's arrest, he was interviewed by LAPD Detectives Michael Levant and Isaac Fernandez. Trevizu admitted he was involved in the Avalos murder but would not implicate anyone else in the crime.

#### Chacon

In an interview on November 5, 2019, Chacon told Detective Fernandez the reason he was driving the Mercedes in the area at the time of Avalos's death was to visit Valencia. He said he was following the Envoy because he wanted to flirt with

21

Renteria.  Chacon explained that while he was driving around he saw Ortega and another individual and gave them both a ride.

*Ortega*

On November 5, 2019, Ortega was interviewed by LAPD Detectives Levant and Fernandez.  Ortega admitted his moniker was "Troubles," and he was a member of the Wynos clique of Southside Watts, though he had not been involved with the gang for three years.  He also claimed not to have a phone number, as the phone he had was only for using Wi-Fi.  People communicated with him through "Messenger or Instagram."

Ortega admitted he knew Sanchez but did not know him well.  Ortega said Sanchez drove a black Nissan Sentra, confirmed where Sanchez lived, and did not know whether Sanchez was a gang member.  Ortega heard Sanchez got "busted" for attempted murder, though he did not know the details, as he was not there.  He speculated Sanchez "[t]weaked out."

Ortega acknowledged he was arrested with Keer, who was someone Ortega sometimes worked for in construction.  He stated Keer's moniker was "Oso," and he was a member of Cuarentas.  Ortega opined Keer was no longer active in the gang.  Ortega said Keer speaks Spanish and his mother is Mexican.

Ortega admitted he knew Renteria, who he believed drove a black Chevy SUV.  He also knew Cruz and Trevizu, who were members of the Wynos clique of Southside Watts.  Ortega admitted he knew Chacon and that Chacon's wife drove a tan Mercedes that Ortega had ridden in twice, once when he went with Chacon to attend Sanchez's July court appearance.

Ortega said he was working a construction job at the time of Avalos's shooting but did not recall whether he was working on that precise date.  When asked by detectives why cell phone

tower records placed Ortega's phone at the crime scene, Ortega had no explanation, but denied involvement in the shooting.

Ortega claimed to have dropped off Renteria at a nightclub called El Malecon, keeping her SUV until the next morning, when he was with Chacon.

Ortega later admitted he killed Avalos because he thought the victim snitched on Sanchez. He said he was the shooter but did not remember how many times he fired the gun. He claimed to have acted alone and knew he was targeting a man who was bandaged up after being recently shot. After the shooting, Ortega walked to Ted Watkins Park with the gun, which he lost later. He identified the gun as a "nine."

Ortega admitted Sanchez shot Avalos in the past with his gun, because Sanchez "was spun the fuck out" and "was hallucinating." Ortega had been stashing his guns in the alley behind Chacon's house. When asked who ordered the shooting, Ortega replied, "Everybody made their own decision that day." He admitted Cruz said, "Hey, I'm in with you, dawg. I'm going to shoot with you."

Ortega explained he was in Renteria's Envoy, and the others involved were with Trevizu in a big SUV. He and the others met up, and everyone followed Ortega. Then they went to pick up guns in Compton, they dropped off Barba, who then got into a Nissan Armada. He and the others then took Renteria's Envoy to the place of the shooting. The gate was open. Ortega walked into the backyard and saw a woman, who began to stutter and ran into the house. When she opened the door, Ortega followed her in and started shooting. Ortega admitted Cruz and Trevizu were with him, and there was another shooter. They fled and returned to where Barba was dropped off.

23

### *The* Perkins *operation*

Following Trevizu's arrest on November 19, 2019, he was placed in a jail cell with a confidential undercover informant, and their conversation was recorded. Trevizu admitted being one of the drivers to the scene of the Avalos murder, but stated, "I didn't know—I didn't know that they were going to do all that, you feel me? [Inaudible] drive me here, so I drove them there and took off. Next thing you know—" When asked, "what's your brother got to do with it?," Trevizu responded, "He's the fuckin' one." Trevizu explained that "the fools that were staying [on 87th], snitched on my homie, for him to get life. So, they went to go get [inaudible]." Trevizu later clarified, "They were doing him a favor. I was just driving." Trevizu admitted his "girl was there that day too," but that she was "waiting for [him] on 89th."

Trevizu said five individuals were involved in the shooting. He identified Keer, whom he referred to as "Oso," as having been involved. He described Oso as being Black, but from Cuarentas, a Mexican gang. Trevizu added, "I was the driver . . . my girl, she was in my car to getaway. Then it was my brother and some other . . . the homie from the hood. Those two were the shooters." When asked where Oso was, Trevizu said, "Oso's the one that told us to go."

Trevizu claimed he did not know about a plan to kill Avalos, but he was aware Avalos was killed because Avalos "was snitching." Trevizu stated, "My brother just told me . . . we got to go and get [Sanchez's] stuff out from this house, you know? And he was saying . . . we got to go get his car, his clothes . . . I'm, like, . . . Let's go. So I go. All right. Shit happened."

Trevizu explained after he dropped off the passengers in his car, his girlfriend picked him up in a different car, a truck.

24

He admitted three cars were used in connection with the killing, and the only one not yet identified by police was his girlfriend's truck.

**Defense evidence**

Neither Chacon nor Ortega presented any affirmative evidence.

Keer presented two witnesses: Jonathan Sabag and Nicholas Turley. Sabag was an electrical contractor who employed Keer and allowed Keer to bring Ortega when a job required extra help. Sabag also allowed Keer to use his Chevy Avalanche, which he eventually sold to Keer. He never observed Keer engage in any criminal behavior.

Turley was a contractor who owned a home on West 90th Street where Keer lived. Keer also worked for Turley on some construction jobs. Sometimes Keer brought Ortega in on jobs. Turley never saw Keer engage in any criminal behavior.

## DISCUSSION

### I. Motion to sever counts eight and nine

Ortega contends the trial court erred in denying his motion to sever counts eight and nine concerning the killing of Baca.[11] Keer and Chacon join this argument.

#### A. *Relevant trial court proceedings*

On June 18, 2021, Chacon moved to sever his trial from count eight on *Aranda–Bruton* grounds, among others.[12] The

---

[11]   Ortega was charged in count eight with the murder of Baca (§ 187, subd. (a)) and in count nine with possession of a firearm by a felon (§ 28900, subd. (a)(1)).

[12]   *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123.

People opposed the motion.  On September 27, 2021, Chacon moved to exclude all evidence relating to him as to count eight in the event the trial court denied his motion to sever.

At a July 28, 2021 pretrial hearing, Chacon's counsel argued the evidence of Chacon's presence at the nightclub at the time of Baca's murder was highly prejudicial.  Counsel also argued the evidence of Chacon socializing with Ortega after the Avalos murder could inflame the jury and prejudice his client.  In addition, counsel was concerned the jury might think Chacon was gathering information for Ortega because he was "sort of looking over sheriffs' shoulders" while they watched nightclub surveillance video of the crime.  In sum, counsel argued failing to sever count eight would violate Evidence Code section 352.  Keer concurred in the arguments made by Chacon's counsel.

The prosecution argued the motion should be denied and the evidence was cross-admissible due to the conspiracy charged in count one.  The prosecution claimed it was entitled to present evidence of the defendants' close friendship and the "nature of their relationship," adding the evidence would show the defendants who were not charged in the Baca murder were "interested and inquiring about whether or not there is surveillance tape, and then trying to view it, [which] is important in showing their loyalty to each other and to Mr. Ortega."  The prosecution claimed no prejudice as Ortega admitted the Baca murder and "takes it all on himself."

The motion to sever count eight was denied.  The court explained it did not "think that the co-defendant being charged with a separate murder is particularly prejudicial to these defendants since there's ample evidence that none of them were involved."  The court noted Keer and Chacon were not charged in

count eight, and a limiting instruction ensuring their presence at the nightclub could not be considered with the remaining counts could be given.

Keer orally moved for severance, arguing, "The people are using . . . evidence of this other murder [Keer's] not charged with which is the classic severance issue to try to strengthen their weaker case which is Avalos against my client by just suggesting where there's smoke there's fire. . . . He's more likely to be involved in this other murder. That's highly prejudicial." The prosecution responded that evidence of the nature of defendants' relationship was highly probative of the conspiracy charge. Keer's counsel claimed the prosecution had ample evidence of the relationship among the defendants even if the court granted the severance motion. Ortega's counsel joined the motion for severance, stating the court should "sever out the Baca murder for Ortega separately. It would save court time and keep irrelevant evidence from coming in against the three defendants with regard to the Baca shooting."

Chacon's counsel asserted the defendants' associating at a nightclub "four" months after the Avalos murder did not mean they trusted each other enough to be involved in a murder conspiracy. He pointed out there was no evidence they came to the club together or left together, arguing it was "guilt by association." The court rejected defendants' arguments.

The court observed the evidence from the Baca murder was relevant to establish the relationship among the defendants. As a result, the motion to sever was denied, but the court explained the jury would be instructed as to which counts pertained to which defendants. The court later added Ortega's statement to the police would be redacted.

27

**B.** *Applicable law and standard of review*

Section 954 states, in part, "[a]n accusatory pleading may charge two or more different offenses connected together in their commission, . . . or two or more different offenses of the same class of crimes or offenses, under separate counts." Offenses are connected when they are """"linked by a "'common element of substantial importance"""""" such as motive or intent. (*People v. Westerfield* (2019) 6 Cal.5th 632, 686 (*Westerfield*).) "'Offenses of the same class are offenses which possess common characteristics or attributes.'" (*People v. Landry* (2016) 2 Cal.5th 52, 76.)

Generally, "the law prefers trying charged offenses together because doing so ordinarily promotes efficiency." (*People v. Anderson* (2018) 5 Cal.5th 372, 388 (*Anderson*); see also *Westerfield, supra*, 6 Cal.5th at p. 689.) However, "the court may order the counts tried separately." (*Anderson, supra*, at p. 388.) Section 954 provides, "[T]he court . . . , in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

The defendant bears the burden of demonstrating the denial of severance was a prejudicial abuse of discretion. (*People v. Kemp* (1961) 55 Cal.2d 458, 477.) "'In determining whether a trial court's refusal to sever charges amounts to an abuse of discretion, we consider four factors: (1) whether evidence of the crimes to be jointly tried is cross-admissible; (2) whether some charges are unusually likely to inflame the jury against the defendant; (3) whether a weak case has been joined with a stronger case so that the spillover effect of aggregate evidence might alter the outcome of some or all of the charges; and (4)

28

whether any charge carries the death penalty or the joinder of charges converts the matter into a capital case.'" (*Anderson, supra*, 5 Cal.5th at pp. 388–389.)[13]

Next, a reviewing court must determine whether joinder resulted in gross unfairness to the defendant. "[E]ven if the trial court's ruling was proper as a matter of state law, we will reverse the judgment if the defendant shows that joinder of the charges actually resulted in ""gross unfairness"" amounting to a denial of due process during the guilt phase." (*People v. Simon, supra*, 1 Cal.5th at p. 123.) While improper joinder does not violate the Constitution, "misjoinder would rise to the level of a constitutional violation . . . if it results in prejudice so great as to deny a defendant his Fifth Amendment right to a fair trial." (*United States v. Lane* (1986) 474 U.S. 438, 446, fn. 8.)

A trial court's erroneous refusal to sever a defendant's trial from a codefendant's trial requires reversal if the defendant shows, to a reasonable probability, that separate trials would have produced a more favorable result (*People v. Tafoya* (2007) 42 Cal.4th 147, 162); or if joinder was so grossly unfair that it deprived the defendant of a fair trial (*People v. Avila* (2006) 38 Cal.4th 491, 575).

We review a trial court's denial of a motion for severance for abuse of discretion. (*People v. Armstrong* (2016) 1 Cal.5th 432, 455–456.) To show an abuse of discretion, a defendant must make a clear showing of prejudice by demonstrating that the

---

[13] We refer to these factors as the *Anderson* factors. Ortega refers to the factors as the *Williams* factors, citing *Williams v. Superior Court* (1984) 36 Cal.3d 441 (*Williams*), superseded by statute as stated in *People v. Simon* (2016) 1 Cal.5th 98, 124, which listed the same factors.

29

denial exceeded the bounds of reason.  We evaluate a defendant's claim in light of the facts known by the trial court at the time of the court's ruling.  (*Westerfield, supra*, 6 Cal.5th at p. 689.)

### C.  *Application of the* **Anderson** *factors shows no abuse of discretion*

The crimes at issue at trial met the statutory requirements for joinder under section 954.  The Baca murder alleged in count eight was the same class of crimes or offenses as alleged in the other counts.  (§ 954.)[14]  We therefore analyze the *Anderson* factors to determine if the trial court's refusal to sever amounted to an abuse of discretion.  (*Anderson, supra*, 5 Cal.5th at pp. 388–389.)

#### 1.  *Whether evidence of the crimes to be jointly tried is cross-admissible*

The People argue the evidence in count eight was admissible to establish the relationship between defendants and, accordingly, to show the existence of the conspiracy charged against defendants in count one.  As set forth in *People v. Bradford* (1997) 15 Cal.4th 1229, 1315–1316, we ask whether evidence on each of the joined charges would have been admissible under Evidence Code section 1101 in separate trials on the other charges.

The prosecution argued the evidence of the Avalos and Baca murders was cross-admissible in light of the conspiracy charged in count one.  It showed defendants knew each other and the nature of their relationship.  Specifically, security camera

---

[14]  As defendants failed to request severance of count nine below, any claim that count nine should have been severed has been forfeited on appeal.  (*People v. Maury* (2003) 30 Cal.4th 342, 392.)

30

footage showed defendants were together at the club the night of the Baca murder, and Ortega and Chacon followed Keer outside shortly before the Baca murder.  In addition, there was evidence Keer and Chacon were inquiring about the surveillance tape, and trying to view it, demonstrating their loyalty to Ortega and to each other.  Orellana provided evidence Keer was with the killer and Keer was the killer's boss.  Orellana further provided evidence Arreaga said to Keer, "how can you let your young men go around with guns.  She said he's going to go and get one . . . and he's going to kill another guy."  Keer instructed Orellana to act as if nothing happened and took interest in the positioning of the surveillance equipment.  All this evidence, the People argue, was cross-admissible to show Keer's role in the conspiracy charged in connection with the Avalos murder.

Defendants disagree the evidence of defendants socializing at the nightclub on the night of Baca's murder was cross-admissible.  Instead, they argue marginal and cumulative evidence that Ortega was at a nightclub with Keer and Chacon on the night of the Baca killing failed to justify admitting all the evidence regarding the conspiracy to murder Avalos in the trial of the Baca killing.

Defendants claim the evidence in the Avalos murder was not cross-admissible for three reasons: (1) the nature of the relationship among the coconspirators in the Avalos murder was not relevant after termination of the conspiracy; (2) there was no common plan, modus operandi or intent between the two murders; and (3) the gang enhancements did not support cross-admissibility of evidence.  We discuss each argument separately.

31

**a.** Evidence after termination of conspiracy

Defendants first argue evidence of a conspiracy must be limited to evidence of the ""'conduct, *relationship*, interests and activities of the alleged conspirators before and during the alleged conspiracy.'"" (*People v. Homick* (2012) 55 Cal.4th 816, 870 (*Homick*).) The overt acts in furtherance of the conspiracy to murder Avalos culminated on July 20, 2019. While defendants concede evidence of the nature of the relationships among the defendants before the murder of Avalos was unquestionably relevant to the conspiracy to murder him, in contrast, the nature of the relationships between defendants after the murder was not relevant to the conspiracy and murder of Avalos, nor was it relevant to the murder of Baca. Thus, defendants argue, the evidence was not cross-admissible.

"'Conspiracy requires two or more persons agreeing to commit a crime, along with the commission of an overt act, by at least one of these parties, in furtherance of the conspiracy.'" (*Homick, supra*, 55 Cal.4th at p. 870.) "If the agreement between the conspirators is the crux of criminal conspiracy, then the existence and nature of the relationship among the conspirators is undoubtedly relevant to whether such agreement was formed, particularly since such agreement must often be proved circumstantially." (*Ibid.*)

Here, the nature of the relationships between the defendants was relevant to the charges of conspiracy to commit murder and murder of Avalos. While the conspiracy to murder Avalos had ended by the time of the Baca murder, evidence of the defendants' interactions and concerns at the nightclub on the night of the Baca murder illuminated the nature of those relationships. While defendants provide citations stating the

32

general principle that evidence of the nature of the relationships between coconspirators prior to and during a conspiracy is admissible, they provide no citation to law expressly forbidding the joinder of later crimes illuminating such relationships.

In *Homick*, the defendant objected to testimony unrelated to the conspiracy to murder the victims. (*Homick, supra*, 55 Cal.4th at p. 870.) The *Homick* court found the trial court did not abuse its discretion in admitting such testimony "as relevant to establish the relationship" between the defendant and a coconspirator. (*Id.* at p. 871.) *People v. Rodrigues* (1994) 8 Cal.4th 1060, 1134–1135, abrogated on other grounds as stated in *People v. Leon* (2020) 8 Cal.5th 831, 848, concerned instructional error and is therefore not relevant.

Defendants also cite *People v. Saling* (1972) 7 Cal.3d 844, 852, *People v. Leach* (1975) 15 Cal.3d 419, 432, and *People v. Hardy* (1992) 2 Cal.4th 86, 147, for the proposition a "conspiracy usually comes to an end when the substantive crime for which the coconspirators are being tried is either attained or defeated." (*Saling, supra*, at p. 852.) *Saling, Leach* and *Hardy* involved arguments that certain statements were erroneously admitted under the coconspirators exception to the hearsay rule found in Evidence Code section 1223. This exception to the hearsay rule is not relevant here, therefore these cases have no bearing on the issues before us.[15] *People v. Zamora* (1976) 18 Cal.3d 538,

---

[15] *Krulewitch v. United States* (1949) 336 U.S. 440 also involved admission of a hearsay statement made by a coconspirator not made in furtherance of the objectives of the conspiracy. The *Krulewitch* court found the statement was "not admissible on the theory that it was made in furtherance of the

33

involved the question of whether the indictment was barred by the then-applicable three-year statute of limitations regarding conspiracies to commit arson, to burn insured property with intent to defraud insurer, and to commit grand theft. (*Id.* at pp. 543–544.) No statute of limitations issue is before us, therefore the case is inapplicable.[16]

None of the cases cited by defendants on this point involved the joinder of separate counts at trial. Unlike in the cases cited above, the prosecution here made no argument the conspiracy to murder Avalos continued beyond the date of his murder. Instead, they argued the evidence concerning events at the nightclub on the night of Baca's murder reinforced the evidence of the relationships between the defendants. Keer, who was implicated in the conspiracy as the leader who ordered the killing, was also identified as the killer's boss at the time of the Baca murder. The evidence of the three defendants together in the club, along with Keer and Chacon's actions following the murder, showed their familiarity and loyalty to each other.

Further, even if the evidence were not cross-admissible, that alone is insufficient to show the trial court abused its discretion by failing to sever the Baca murder count. (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1221 (*Alcala*) ["even the complete absence of cross-admissibility does not, by itself, demonstrate prejudice from a failure to order a requested severance"].) The Supreme Court has "repeatedly . . . found a

---

alleged criminal transportation undertaking." (*Id.* at pp. 442–443.)

[16] *Grunewald v. United States* (1957) 353 U.S. 391 also involved the statute of limitations, thus is unhelpful to defendants.

34

trial court's denial of a motion to sever charged offenses to be a proper exercise of discretion *even when the evidence underlying the charges would not have been cross-admissible in separate trials.*" (*Ibid.*) Thus, even if the evidence were not cross-admissible, the trial court's ruling is not an abuse of discretion unless the defendants can show clear prejudice. (*Id.* at p. 1220.)[17]

### b. No common plan, modus operandi or intent

Defendants next argue the evidence of the Baca murder would not have been cross-admissible under Evidence Code section 1101, subdivision (b), which provides, in part: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . .)." Here, defendants argue the two murders did not involve any common plan, modus operandi or intent. (Citing *People v. Edwoldt* (1994) 7 Cal.4th 380, 402.) Thus, defendants argue, the prosecution sought to create an inference through the use of impermissible character evidence, in violation of the Evidence Code and defendants' due process rights.

Ortega argues evidence of the Avalos murder constituted impermissible character evidence as to the Baca murder, serving to create the likely inference that a person who would execute a witness would not have acted in self-defense, imperfect self-defense or heat of passion in a totally unrelated incident. Keer takes the opposite position, that evidence of his presence and actions at the nightclub at the time of the Baca murder would not

---

[17]    Prejudice is discussed separately below in part I.D.

have been admissible to show he was directing Ortega's, or any other individual's, actions at the time of the Avalos murder.

Defendants' arguments regarding character evidence do not convince us joinder was an abuse of the trial court's discretion in this matter. "'The state's interest in joinder gives the court broader discretion in ruling on a motion for severance than it has in ruling on admissibility of evidence.'" (*Alcala, supra*, 43 Cal.4th at p. 1221.) The evidence that Keer, Chacon and Ortega were united in loyalty and camaraderie during both events was relevant to both the conspiracy and the murder charges in the Avalos case. Further, as set forth above, the absence of cross-admissibility alone is insufficient to demonstrate prejudice. (*Ibid.*)

### c. The gang enhancements

Defendants next argue the gang enhancements did not support cross-admissibility of the evidence. Defendants argue there was unrefuted testimony the Cuarentas gang no longer existed, and even if they were still members of a viable gang, evidence of their common gang membership was irrelevant to the Baca shooting, as the prosecution presented no evidence the shooting was gang-related.

The prosecution initially charged gang enhancements to the conspiracy and both murders. However, the trial court bifurcated the trial of the gang enhancements. Ultimately the gang enhancements were dismissed upon motion of the prosecution.

The prosecution does not argue the gang enhancements provided justification for joinder. Instead, they argue the defendants' actions were relevant to show defendants' relationships with each other and the social hierarchy among

36

them.  Thus, defendants' argument the gang enhancements did not support cross-admissibility of the evidence does not convince us that joinder was an abuse of the trial court's discretion in this matter.

> **2.** *Whether some charges are unusually likely to inflame the jury*

The second *Anderson* factor asks whether the evidence in one of the charges was unusually likely to inflame the jury. Defendants argue the Avalos murder was unusually inflammatory.  The evidence in the Baca case was presented after the jury had already heard all the evidence in the Avalos murder. Thus, when the jury heard evidence of the altercation in the parking lot outside the nightclub, it had already heard Ortega's own recorded statement admitting his role as a shooter in the execution of Avalos.  In addition, Orellana testified she told a detective that "Osito was the boss . . . of the one who killed" Baca, and that Keer continued dancing with her after the shooting, as if nothing happened.  Defendants argue the jury was bound to link evidence that Keer was the shot-caller in the Avalos murder with Orellana's testimony he was the boss of Ortega; that he reacted callously after Baca was shot; and that Arreaga was afraid to testify against those who killed Baca.  Ortega argues nothing could have been more prejudicial to the jury's decision in the Baca shooting than demonstrating his propensity for violence in the prior execution of Avalos.

In support of this argument, defendants cite *U.S. v. Bradley* (9th Cir. 1993) 5 F.3d 1317, 1321.  *Bradley* involved a question concerning the admission of evidence of an uncharged crime under Federal Rules of Evidence, rule 403 (28 U.S.C.). However, in *Bradley*, the court concluded the trial court abused

its discretion in admitting the evidence due to the vague nature of the evidence, which did not "rise above the concept of 'unsubstantiated innuendo.'" (*Bradley*, at p. 1321.)  The court explained, "Especially as Bradley is concerned, there was almost no evidence connecting him with the [uncharged] slaying.  As the Supreme Court said . . . , the prosecution may not 'parade past the jury a litany of potentially prejudicial similar acts that have been established or connected to the defendant only by unsubstantiated innuendo.'" (*Id.* at p. 1320.)

Defendants cite no legal authority suggesting the evidence regarding the Avalos murder was so inflammatory as to render joinder erroneous.  In *Alcala, supra*, 43 Cal.4th at page 1227, our Supreme Court found certain prior sexual assaults and murders the defendant had committed were not "'unusually likely to inflame' a jury" that would hear similar evidence concerning another abduction and brutal murder.  Similarly, in *People v. Lamb* (2024) 16 Cal.5th 400, 418, the high court rejected a defendant's argument that joinder was improper on the grounds of the inflammatory nature of one of the crimes, stating, "[n]either the murder count nor the attempted murder count was more inflammatory than the other."  Here both crimes involved gunshots that killed an unarmed individual.  While one shooting appeared to have involved more complex planning, this did not render it significantly more inflammatory than the other.

**3.** *Whether the case involved joining a weak case with a strong one*

Neither case was comparatively stronger or weaker. Substantial evidence supported both cases.

As to the Avalos murder the evidence included Sanchez's testimony, cell phone and social media records, Renteria's

38

testimony, Barba's testimony, and surveillance video. In addition, there was evidence gathered from a *Perkins* operation and Ortega's admission he killed Avalos.

As to the Baca murder, the evidence included the testimony of witness Rojas, as well as other witness statements and corroborating surveillance video. Ortega's social media records included a confession.

In light of this evidence, we conclude neither case was substantially  stronger or weaker than the other. "[A]s between any two charges, it always is possible to point to individual aspects of one case and argue that one is stronger than the other. A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges." (*People v. Soper* (2009) 45 Cal.4th 759, 781.)

*Bean v. Calderon* (9th Cir. 1998) 163 F.3d 1073, 1083, is distinguishable. There, a defendant was convicted of the first degree murders, robberies and burglaries of two women and sentenced to death. (*Id.* at pp. 1074–1075.) The Ninth Circuit found "joinder of the . . . indictments deprived [defendant] of a fundamentally fair trial" because "consolidation of the relatively weak . . . case with the compelling . . . charges in a single trial violated [defendant's] right to due process by leading the jury to infer criminal propensity." (*Id.* at p. 1083.) Such is not the case here, where overwhelming evidence supported defendants' roles in each crime.

Similarly, *Williams, supra*, 36 Cal.3d at page 449, relied upon heavily by defendants, involved a defendant facing two murder charges in which "one of the crucial issues facing the jury [was] the identity of the perpetrator(s) of the two killings and

related crimes." *Williams* was also a capital case, and the court noted it "must analyze the severance issue with a higher degree of scrutiny and care than is normally applied in a noncapital case." (*Id.* at p. 454.) First, the *Williams* court determined "evidence of each shooting incident would not be admissible to prove identity in the respective trial of the other under Evidence Code section 1101, subdivision (b)." (*Id.* at p. 450.) Despite determining this factor weighed against joinder, the court recognized "it does not necessarily follow that the trial court was compelled to sever the two murder counts." (*Id.* at p. 451.) The court went on to analyze the other relevant factors and concluded joinder would be very prejudicial because it involved "the joinder of one weak and one strong case or alternatively of two relatively weak cases." (*Id.* at p. 453.) The court's "principal concern [was] in the danger that the jury . . . would aggregate all of the evidence, though presented separately in relation to each charge, and convict on both charges in a joint trial; whereas, at least arguably, in separate trials, there might not be convictions on both charges." (*Ibid.*)

Here, identity was not at issue, and overwhelming evidence supported the verdicts. Unlike in *Williams*, both cases here would likely have resulted in convictions had they been tried separately. We therefore conclude this factor does not weigh against joinder in this case.

**4.** *Whether any charge carries the death penalty or joinder of charges converts the matter to a death penalty case*

This factor is not relevant to our analysis. The prosecutor never sought the death penalty, thus this factor does not

"militate[] against the benefits of joinder in the present proceedings." (*People v. Soper, supra*, 45 Cal.4th at p. 780.)

### 5. *Conclusion*

On the record before us, considering the factors set forth above, we conclude defendants have failed to carry their burden of showing the trial court abused its discretion in failing to sever count eight.

### D. *Prejudice*

"'[E]ven if a trial court's ruling on a motion to sever is correct at the time it was made, a reviewing court still must determine whether, in the end, the joinder of counts or defendants for trial resulted in gross unfairness depriving the defendant of due process of law.'" (*People v. Soper, supra*, 45 Cal.4th at p. 783.) "[A] judgment will be reversed on this ground only if it is 'reasonably probable that the jury was influenced [by the joinder] in its verdict of guilt.'" (*People v. Merriman* (2014) 60 Cal.4th 1, 49.)

As set forth above, Ortega argues the evidence of the Avalos murder constituted impermissible character evidence regarding the Baca murder trial, serving to create the likely inference that a person who would execute a witness would not have acted in self-defense, imperfect self-defense or heat of passion in a different, unrelated incident.

Keer's position is the opposite of Ortega's in that Keer argues the evidence presented concerning the Baca murder was extremely harmful to him. Specifically Keer claims although he was not charged in the Baca murder, the evidence presented related to that case painted him as a boss of young shooters and implied he was a leader of Ortega and Chacon. Particularly as to the statement made by waitress Arreaga, Keer argues, "the

41

prosecutor was explicitly and powerfully using the Baca murder evidence to retroactively imply that Keer must have orchestrated what happened to Avalos months earlier."

We conclude there was no reasonable probability that the joinder of counts tainted the jury's verdicts in this case. Overwhelming evidence, described in detail above, supported each conviction. Further, the record shows the jury carefully weighed each charge, finding Ortega not guilty of the attempted murder in count three, while finding Ortega guilty of second degree murder as to the killing of Baca. "The acquittal[] demonstrate[s] a careful sifting of the evidence and a properly cautious verdict." (*People v. Moore* (1986) 185 Cal.App.3d 1005, 1013; see also *People v. Jones* (2013) 57 Cal.4th 899, 927 ["Where the jury returns a guilty verdict of a lesser crime, . . . we are confident the jury was capable of, and did, differentiate among defendant's crimes."].)

The trial court did not abuse its discretion in declining to sever count eight.

## II.    Admission of Arreaga's hearsay statement

Defendants argue the trial court erred when it admitted Arreaga's hearsay statement under the exception for excited utterance or spontaneous statement of Evidence Code section 1240. Orellana testified that Arreaga said to Keer, "How is it possible that you allow the guys that are with you to bring out weapons? He went out over there to fight with the other young man and he pulled the gun out on him!"[18]

---

[18]    Orellana first reported Arreaga's statement as, "Osito, how can you let your young men go around with guns? He's going to go and get one and he's going to kill another guy." Later in the same interview she reported the statement as, "How can you let

42

## A. *Relevant proceedings*

On November 18, 2021, the prosecution filed its motion in limine seeking admission of Arreaga's statement pursuant to Evidence Code section 1240. Defense counsel argued the statement should not be admitted because Orellana changed her statement several times, Arreaga was expected to testify, and Arreaga had denied making the statement. Defense counsel also argued it was objectionable on multiple grounds, as it was speculative, conclusionary, and a statement of opinion. Keer's counsel argued the statement was particularly inflammatory as to his client, who was not charged in the Baca murder. The prosecution argued that although Orellana had made multiple statements, "the inherent meaning of them is the same throughout." In addition, the prosecution argued the jury should decide "which is the true statement, what Ms. Orellana claims she heard or what Ms. Arreaga claims she did not say."

The trial court admitted Arreaga's statement as a spontaneous statement, warning it was granting the motion "so long as the appropriate foundation is laid prior to the D.A. asking the witness about those statements. So you have to lay foundation that would show there was some event that supports the fact these were spontaneous or excited utterances which would give it an air of credibility. It's going to be up to the jury how much weight, if any, to give those statements." The court also noted the defense could challenge the statements by impeaching the witness or through other evidence.

---

your guy go around with a gun? He's going to get another one from the other guy!"

43

At trial, the prosecutor sought to ask Orellana about statements she made during her interview with police. Keer's counsel objected that the prosecution should not be permitted to ask Orellana about Arreaga's hearsay statement, "He's going to go and get one and he's going to kill another guy." Counsel argued there was no evidence Arreaga ever said that, and to allow it would be prejudicial under Evidence Code section 352. The court disagreed, finding the statement to be an excited utterance "given the fact that apparently there was an incident going on outside. She comes in, you can tell from her body language that she's acting in an urgent fashion." The court further noted the statement could be used as impeachment evidence because when asked about it, Arreaga denied making the statement. Therefore the statement "does impeach her testimony [and] challenges her memory as to that issue as well." The court saw no undue prejudice, especially because the statement could be "argued both ways."

The prosecutor asked Orellana, "Did you tell the police that: (reading): [¶] '[H]e was dancing with me, and then the waitress said, hey—she said because they called him Osito—hey, she said, Osito, how can you let your young men go around with guns. She said he's going to go and get one she said and he's going to kill another guy.' [¶] Did you tell the police that that's what [Arreaga] said?" Orellana responded, "I don't remember."

B. *Applicable law*

Evidence Code section 1240 permits admission of a hearsay statement if it "[p]urports to narrate, describe, or explain an act, condition, or event perceived by the declarant," and "[w]as made spontaneously while the declarant was under the stress of excitement caused by such perception." (Evid. Code, § 1240,

subds. (a) & (b).)  The admissibility of an excited utterance under Evidence Code section 1240 is reviewed for abuse of discretion. (*People v. Roberts* (2021) 65 Cal.App.5th 469, 477.)

"'To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it.'"  (*People v. Poggi* (1988) 45 Cal.3d 306, 318.)

Whether a statement in question was made while the declarant was still under the stress and excitement of the startling event is analyzed through a number of factors, including "'the passage of time between the startling event and the statement, whether the declarant blurted out the statement or made it in response to questioning, the declarant's emotional state and physical condition at the time of making the statement, and whether the content of the statement suggested an opportunity for reflection and fabrication.'"  (*People v. Sanchez* (2019) 7 Cal.5th 14, 40.)  "'[N]o one factor or combination of factors is dispositive.'"  (*Ibid.*)

"Whether an out-of-court statement meets the statutory requirements for admission as a spontaneous statement is generally a question of fact for the trial court, the determination of which involves an exercise of the court's discretion.  [Citation.] We will uphold the trial court's determination of facts when they are supported by substantial evidence and review for abuse of

discretion its decision to admit evidence under the spontaneous statement exception." (*People v. Merriman, supra*, 60 Cal.4th at p. 65.)

### C.   *Analysis*

Ortega claims Arreaga's hearsay statement did not qualify as an excited utterance because (1) it did not relate to the circumstance immediately preceding it, and (2) it expressed her opinions that Keer allowed his men to carry guns and that Ortega would get a gun and shoot Baca.

First, Ortega argues the statement manifestly failed to relate to the occurrence Arreaga just witnessed—an altercation between Ortega and Baca outside the nightclub. Instead, Ortega argues, the statement related to her opinion that Keer allowed his men to go around with guns, and her opinion that Ortega would get a gun and shoot Baca.

The People disagree, arguing the statement was made immediately after Arreaga witnessed the fight outside the nightclub. It narrated her observation of the two men fighting, one of whom she believed would retrieve a gun and use lethal force, thus constituting a startling event.

The trial court determined it was an excited utterance because "apparently there was an incident going on outside." The court also referenced Arreaga's body language as viewed on the surveillance video, noting: "She comes in, you can tell from her body language that she's acting in an urgent fashion." In addition, her statement, "[h]e's going to go and get one and he's going to kill another guy," related to the altercation she had observed outside and her description of what she observed to be happening. (Evid. Code, § 1240, subd. (a) [permitting admission

46

of excited utterance if it purports to describe an event perceived by the declarant].)

As to Ortega's second argument, the trial court did not abuse its discretion in disagreeing with Ortega's claim that Arreaga's excited utterance was merely a statement of opinion. Instead, her words "purport[ed]" to describe the events she perceived outside of the nightclub. (Evid. Code, § 1240, subd. (a).) Arreaga purportedly witnessed one of Keer's "young men" in a fight, on his way to retrieve a gun and kill another individual.

The trial court noted the evidence Arreaga made the statement could be "argued both ways." It also may have impeached her, as she later could not recall making the statement.

Considering the factors set forth in *People v. Sanchez, supra*, 7 Cal.5th at page 40, we find they weigh in favor of the trial court's decision. The statement was made immediately following Arreaga's observation of the startling event. She blurted it out in response to seeing the fight outside—blaming Keer for allowing his men to go around with guns and explaining to him that a killing was about to take place. Arreaga was acting in an urgent manner, having just witnessed the altercation outside and did not have the opportunity for reflection or fabrication. Under the circumstances, we find the trial court did not abuse its discretion in admitting Arreaga's statement as an excited utterance.[19]

---

[19] Because we have determined the trial court did not err in admitting Arreaga's statement as an excited utterance, we decline to address the parties' competing arguments regarding prejudice.

47

## III. Prosecutorial misconduct

Ortega argues the prosecution committed misconduct during closing argument by arguing false evidence, shifting the burden of proof, and making improper comments on Ortega's silence, thus violating his federal constitutional rights to due process and a fair trial. (Citing U.S. Const., 5th & 14th Amends.; *Darden v. Wainwright* (1986) 477 U.S. 168, 181; *People v. Hill* (1998) 17 Cal.4th 800, 819.)

### A. *Relevant trial court proceedings*

As Ortega's claim arises from the prosecutor's closing argument, we set forth relevant portions of the parties' closing arguments below.

Ortega claimed self-defense in the Baca murder. During Ortega's counsel's closing argument, counsel referenced the witness's descriptions of Baca as being big and Ortega as little. He argued, "this is a really big guy and a really little guy facing off against each other. Obviously by now you understand that's the point . . . ." Counsel further argued Baca lunged at Ortega, prompting a fight before the shooting. Counsel added, "He had no intent to kill. He was in the moment." From this point, counsel moved to a discussion of justifiable homicide and self-defense.

During rebuttal, the prosecutor pointed to evidence undermining Ortega's claim of self-defense, referring to Rojas's testimony that Ortega pulled a gun on Baca after Baca asked for a cigarette. The prosecutor added Baca did not follow Ortega when he went to Keer's truck to retrieve the gun, describing Ortega as in control, pointing out he was "calmly walking" and "cool, collected." From this evidence, the prosecutor argued the murder was not self-defense.

Counsel for Keer objected the prosecution was "burden-shifting." The court reminded the jury that it was obligated to follow the jury instructions, nodding in the affirmative that it understood the court's admonition. The prosecutor resumed argument, expressly stating the People had the burden of proving the Baca killing was not done in self-defense. After detailing the requirements to prove provocation, the prosecutor argued:

". . . I'm going back to the second requirement. Did Mr. Ortega actually act under the influence of that intense emotion? Did he say, oh, my—like after he did it, oh, my God, I can't believe I did that. I acted out of—you know, like I couldn't help myself. Was that him? Was that Mr. Ortega? Mr. Ortega . . . you know some things about him and his temperament. He committed that murder two-and-a-half months earlier of Mr. Avalos, and he was able to be on his phone during this event. He's able—you know, Mr. Ortega—and not only do you know this—not only do you know that he is not like—this kind of—you know, actually acted [out] of this intense emotion or passion, at least not given that level of provocation, you know he wasn't. He is very capable of cold, calculated killing.

"And on top of that, you also know that he wasn't acting out of this intense emotion from passion rather than judgment because you also heard what his reaction was afterwards; right? Did he say on social media, oh, my gosh, like I couldn't help myself."

Counsel for Ortega objected on the ground of *Griffin* error.[20] At a sidebar conference, counsel for Ortega argued the

---

[20] *Griffin v. California* (1965) 380 U.S. 609 (*Griffin*). Under *Griffin,* the Fifth Amendment bars a prosecutor from "'suggesting to the jury that it may treat [a] defendant's silence as substantive

49

prosecutor had impermissibly "comment[ed] on [Ortega's] silence and [Ortega] is not obligated to say anything . . . . [The prosecutor] cannot talk about what Ortega did not say." Counsel asked the court to admonish the prosecutor to stop and to instruct the jury on Ortega's right to remain silent.

The prosecutor claimed to be "talking about [Ortega's] actual comments after he committed the crime." The prosecutor clarified he was "not talking about Mr. Ortega not taking the stand or his right to remain silent or not talking with police."

Keer's counsel then argued the prosecutor was "purposely not putting up Ortega's statement about the second murder and then arguing to the contrary what he knows not to be the case." Counsel noted Ortega "claimed self-defense when he talked to the police about the second murder, so I think . . . arguing anything to the contrary is a problem." The prosecutor countered he was "merely commenting on [the] statement that he made on social media about the second murder which is very clear and been presented into evidence." The prosecutor clarified he was referring to Ortega's statement he was the individual who "smoked" the victim on "Beach and Firestone."

While acknowledging the prosecution had "come close" to making reference to the fact that Ortega did not testify, the prosecutor "thought [he] was being clear," and was "referring to what he said on social media." The trial court found no violation but admonished the prosecutor to "be careful."

When the prosecutor resumed his argument, he specifically referenced Ortega's social media comments after Baca's murder:

---

evidence of guilt.'" (*United States v. Robinson* (1988) 485 U.S. 25, 32.)

"So tell me who just got smoked on Beach and Firestone . . . . Cuz I'm the one who did that. I'm the one who did that." The prosecutor argued, "This is a response that isn't a response of, you know, I had a passion, I lost my mind. He's bragging about it."

Following argument the court instructed the jury: "Now, again, I will indicate to you that in this case the defendants have an absolute constitutional right not to testify and they are entitled to rely on the state of evidence and argue that the People have the duty to prove the charges beyond a reasonable doubt. So do not consider for any reason at all the fact that the defendants did not testify. Do not discuss that fact during your deliberations or let it influence your decision in any way."

## B. *Applicable law and standard of review*

It is prosecutorial misconduct under state law if the act involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. (*People v. Hill, supra*, 17 Cal.4th at p. 819.) "'"A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct "so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process."'"'" (*Ibid.*) Generally, "'"[a] prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that may be drawn from the evidence."'" (*People v. Peoples* (2016) 62 Cal.4th 718, 796.)

A claim of prosecutorial misconduct is reviewed for abuse of discretion. (*People v. Lima* (2022) 80 Cal.App.5th 468, 477.) "'To prevail on a claim of prosecutorial misconduct based on remarks to the jury, the defendant must show a reasonable likelihood the

51

jury understood or applied the complained-of comments in an improper or erroneous manner.'" (*Id.* at pp. 477–478.) Where a prosecutor commits misconduct, a defendant's conviction will not be reversed "'"unless it is reasonably probable that a result more favorable to the defendant would have been reached without the misconduct."'" (*People v. Young* (2019) 7 Cal.5th 905, 932–933.)

### C. *False evidence*

Ortega first argues the prosecution presented false evidence, claiming the prosecutor knew Ortega told police he acted in self-defense when he shot Baca. While the prosecution chose not to introduce Ortega's statement into evidence, he argued to the jury, "Did he say . . . after he did it, oh, my God, I can't believe I did that[?] . . . I couldn't help myself. . . . [¶] . . . Did he say on social media, oh, my gosh, . . . I couldn't help myself[?]"[21]

Ortega argues the prosecutor's argument that Ortega did not claim "I couldn't help myself" was false in light of Ortega's statements to police that he was acting in self-defense, and this false and misleading argument deprived Ortega of due process. Ortega cites *People v. Sakarias* (2000) 22 Cal.4th 596, 633, for the proposition that "[a] prosecutor's knowing use of false evidence or

---

[21]  Ortega's statement he acted in self-defense during the Baca murder was not introduced at trial. Ortega's counsel argued, "The people are purposely not putting up Ortega's statement about the second murder and then arguing to the contrary what he knows not to be the case." "He claimed self-defense when he talked to the police about the second murder, so I think . . . arguing anything to the contrary is a problem." Ortega's counsel informed the court it could not put on Ortega's statement about self-defense because Ortega was not going to testify. The court noted, "The People could have put it on, but he didn't."

52

argument to obtain a criminal conviction or sentence deprives the defendant of due process." Ortega claims the prosecutor's acts constituted "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." (*People v. Strickland* (1974) 11 Cal.3d 946, 955.)

First, we address the People's argument that Ortega forfeited this claim of error by failing to raise it at trial. "Counsel has an obligation to state the '*specific ground* for an objection in order to preserve the issue for appeal.'" (*People v. Reyes* (2016) 246 Cal.App.4th 62, 77.) Here, counsel objected to this line of argument at trial on the basis of *Griffin* error and never explicitly objected the prosecutor was presenting false evidence. Thus, defense counsel deprived the prosecution of an opportunity to address the claim of false evidence below, clarify its comments to the jury, or otherwise correct any misimpression of false evidence. Given these circumstances, the prosecutor's forfeiture argument is well taken. However, we address Ortega's substantive claims and conclude that, even if he had not forfeited this specific argument, the prosecutor did not commit prosecutorial misconduct by presenting false evidence.

As the record shows, the prosecutor's argument was based on Ortega's social media message following the Baca murder, indicating he committed the murder of the individual who died at Beach and Firestone. The prosecutor commented to the jury on what the social media post did not say—"Did he say, oh, my—like after he did it, oh, my god, I can't believe I did that. I acted out of—you know, like I couldn't help myself." Following defense counsel's objection and arguments before the judge, the prosecutor clarified his comments were directed to Ortega's social media comments, which were in evidence. He argued, "This is a

response that isn't a response of, you know, I had a passion, I lost my mind. He's bragging about it." Thus, when viewed in the context of the entire record, it is apparent the prosecutor was fairly commenting on evidence introduced at trial. By tying his comments specifically to the evidence, the prosecutor negated any suggestion he was introducing false evidence.

Even if the prosecutor's comments could be characterized as misconduct, no prejudice arose from the comments. The prosecutor clarified any confusion caused by his initial comments by explaining those comments were specifically directed at Ortega's social media posts. Furthermore, the evidence in the Baca murder overwhelmingly established Ortega's guilt. Thus, Ortega failed to show " 'a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (*People v. Ochoa* (1998) 19 Cal.4th 353, 427.)

### D. *Shifting of burden of proof*

Ortega next argues the prosecutor committed prosecutorial misconduct by shifting the burden of proof during his closing argument. (Citing *People v. Stansbury* (1993) 4 Cal.4th 1017, 1057, reversed on another ground in *Stansbury v. California* (1994) 511 U.S. 318.) Ortega claims the prosecution's argument regarding what Ortega did not say on social media signaled to the jury that Ortega had an obligation to affirmatively make statements to others, or on social media, that he was innocent.

Initially, the People argue the issue is forfeited because defense counsel failed to object on this ground below. (*People v. Reyes, supra*, 246 Cal.App.4th at p. 77.) As Keer's counsel objected the prosecution was burden-shifting, we disagree. Counsel for Ortega and Chacon were not required to make this

54

objection a second time, as a defendant is excused from making a timely objection or requesting an admonition if either would have been futile. (*People v. Arias* (1996) 13 Cal.4th 92, 159.)

*People v. Weaver* (2012) 53 Cal.4th 1056 (*Weaver*), cited by Ortega, discusses the law surrounding prosecutorial misconduct when there is a claim of improper burden-shifting. *Weaver* involved the trial of a defendant who was convicted of first degree murder, with a special circumstance of robbery, among other things. The prosecutor began his closing argument by saying, "'[A]s I sat here listening to counsel, I kept waiting. I kept waiting. I kept waiting for the answer that I think the court was probably waiting for from the defense, and that was, well, if it wasn't [the defendant], just who the heck was it? Who was it?'" (*Id.* at p. 1076.) The prosecutor repeated this argument later, indicating "'I kept waiting for [defense counsel] to offer this court some alternative, . . . some other third person who committed this crime.'" (*Ibid.*) At that point defendant objected that the prosecutor was attempting to shift the burden of proof. (*Ibid.*)

The defendant in *Weaver* argued the prosecutor's argument shifted the burden of proof by suggesting a defendant must provide affirmative evidence of his innocence, not just raise a reasonable doubt. The *Weaver* court stated the rule that "'it is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements [citation].'" (*Weaver, supra*, 53 Cal.4th at p. 1077.) However, the prosecutor in *Weaver* did not violate this rule. The high court explained, "It was not misconduct to observe that defense counsel had failed to explain how this evidence could be reconciled with the conclusion that anyone other than defendant

had committed the charged offenses.  The prosecutor permissibly commented on the state of the evidence." (*Ibid.*)

Here, as set forth above, the prosecutor similarly permissibly commented on the state of the evidence.  He walked the jury through all of the requirements to prove self-defense and referred the jury to the jury instructions.  When Keer objected the prosecutor was burden-shifting, the court reminded the jury that it was obligated to follow the jury instructions, and the jury indicated it understood the court's admonition.  The prosecutor resumed argument and expressly told the jury he had the burden of proving the Baca killing was not done in self-defense.  He then discussed provocation and manslaughter, and detailed the requirements to prove provocation.  The court also reminded the jury after argument that the People have the obligation to prove the charges beyond a reasonable doubt, and the written instructions correctly stated the law.

The prosecutor did not misstate the law, nor did he attempt to mislead the jury into believing the prosecutor did not bear the burden of proof on each element of the charged crimes.  Instead, he commented on Ortega's social media posts, which were included as evidence at trial.

### E.    Griffin *error*

The Fifth Amendment to the United States Constitution prohibits a prosecutor from commenting on a criminal defendant's invocation of his constitutional right to remain silent in the face of criminal charges.  (*Griffin, supra*, 380 U.S. 609.) "Directing a jury's attention to a defendant's failure to testify at trial runs the risk of inviting the jury to consider the defendant's silence as evidence of guilt." (*People v. Lewis* (2001) 25 Cal.4th 610, 670.)  The prohibition of *Griffin* is violated where there is a

56

"'reasonable likelihood that any of the [prosecutor's] comments could have been understood, within its context, to refer to defendant's failure to testify.'" (*People v. Sanchez* (2014) 228 Cal.App.4th 1517, 1523.)

Ortega argues the prosecutor committed such error in this case by arguing there was no evidence of self-defense or provocation, when this argument could not be refuted by Ortega's testimony because Ortega exercised his right not to testify at trial.

We find the prosecutor's remarks did not rise to the level of *Griffin* error. "[T]he rule prohibiting comment on defendant's silence does not extend to comments on the state of the evidence . . . ." (*People v. Medina* (1995) 11 Cal.4th 694, 755.) As discussed at length above, the prosecutor's remarks, viewed in context, were a fair comment on the state of the evidence. The prosecutor was highlighting Ortega's comments on social media and pointing out a lack of any indication the shooting was done in self-defense. The remarks contained no suggestion Ortega's silence at trial should be considered evidence of guilt.

Further, even if the prosecutor's comments could be characterized as misconduct, no prejudice arose from the comments. The evidence in the Baca murder overwhelmingly established Ortega's guilt. Thus, Ortega failed to show "'a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.'" (*People v. Ochoa, supra*, 19 Cal.4th at p. 427.)

IV.  **Cumulative error**

Ortega argues the cumulative effect of prosecution misconduct and other trial errors must be assessed in determining whether reversal is required under the federal

57

Constitution. Ortega cites *People v. Hill, supra*, 17 Cal.4th at pages 815, 844–845, where the court determined: "The most disturbing aspect of this case was the outrageous and pervasive misconduct on the part of the state's representative at trial: the public prosecutor. [A]lthough we might find any individual instance of prosecutorial misconduct or other error harmless standing alone, we cannot ignore the combined prejudicial effect these many missteps had on the overall fairness of the trial. Finding the cumulative prejudice flowing from the combination of prosecutorial misconduct and other errors rendered defendant's trial fundamentally unfair . . . ." Ortega contends this court must consider the combined effects of the erroneous denial of severance, the erroneous admission of Arreaga's hearsay statements, as well as the prosecutorial misconduct in determining prejudice.

When a defendant claims cumulative error, the "test is whether defendant received due process and a fair trial." (*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 349, disapproved on other grounds in *People v. Witmer* (2014) 59 Cal.4th 733, 739–741.) "[W]e review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence." (*Ibid.*)

We have reviewed each of Ortega's allegations and determined no error occurred, thus no cumulative error occurred, and Ortega received a fair trial.

58

## V. Hearsay objections to Trevizu's statements in *Perkins* operation

Keer argues the court erred in overruling hearsay objections to Trevizu's statements made during the *Perkins* operation that purported to describe statements made by Keer.

### A. *Relevant background*

On October 15, 2021, the People sought to admit statements Trevizu made relating to the Avalos murder during an undercover *Perkins* operation conducted with Trevizu. Chacon filed a motion seeking to delete any references Trevizu made to him during the *Perkins* operation. On November 18, 2021, Keer filed his own motion to exclude the statements Trevizu made during the *Perkins* operation.

The court addressed the motions on November 29, 2021. Keer's counsel argued Trevizu's statements were based on "hearsay rumors [Trevizu] heard after the fact." "There's nothing to suggest that . . . Trevizu would have personal knowledge . . . that the hit was ordered and this was going to be a shooting until he got into it." "So there isn't much to suggest they had this prior relationship or had personal knowledge that [Keer] was . . . running things or had ordered a hit . . . ." Counsel argued, "we don't know the source of the knowledge as to why [Trevizu] claims to this *Perkins* agent that [Keer] was the shot caller." Keer's counsel argued Trevizu's statements were therefore unreliable. Counsel stressed that Trevizu had no personal connection to Keer, there was no evidence of any direct communication between the men, that Keer could not cross-examine Trevizu, and "[w]e're speculating about where he got this knowledge as key evidence" against Keer. In addition, Keer's

counsel argued the *Perkins* agent was "primed to elicit certain information" and asked "a lot of leading questions."

Ortega's counsel argued the statements were not relevant to him, as he was barely mentioned, but the statements were nevertheless "blatant hearsay," which the court should not admit. Counsel further argued the prosecutor could not show Trevizu had personal knowledge of the information he provided.

Chacon's counsel pointed out there was a reference to Chacon being a driver, arguing it was the *Perkins* agent who suggested it was a conspiracy, and Trevizu never made any such statement. Counsel asserted Trevizu's statement did not support a conspiracy charge.

The prosecutor characterized the *Perkins* operation to be a "casual conversation between . . . Trevizu and what he believes to be a fellow inmate." The prosecutor argued Trevizu had no reason to name Keer as the person who ordered the murder other than it was the truth. Thus, Keer's arguments should go to the weight, not the admissibility, of the evidence. In reply, Keer's counsel argued Trevizu's statements were made four months after the murder, which detracts from the reliability of the statements.

The court overruled the defendants' objections to the admission of the statements made by Trevizu during the *Perkins* operation, relying on *People v. Arceo* (2011) 195 Cal.App.4th 556. The court also noted the statements were not testimonial, but were declarations against interest, an exception to the hearsay rule. The court granted the People's motion to admit Trevizu's statements made during the *Perkins* operation, noting the court would allow the jury to determine whether Trevizu's statements were credible.

60

On appeal, Keer argues the most critical piece of evidence suggesting Keer was the architect of the murder of Avalos was the *Perkins* operation conducted on Trevizu, the brother of shooter Cruz. Trevizu was alleged to have driven Cruz and fellow shooter Ortega to the scene of the Avalos murder. Trevizu claimed a person named "Oso" (Keer) from "Cuarentas" was "the one that told us to go" but Oso himself "didn't even go" to the shooting. Trevizu appeared to agree with the undercover agent's statement that "Oso" was the "shot caller."

**B.** *Applicable law and standard of review*

Hearsay, an out-of-court statement offered to prove the truth of the matter asserted, is generally inadmissible under California law. (Evid. Code § 1200.) However, exceptions to the hearsay rule exist, including in Evidence Code section 1230, which describes the exception for a declaration against interest: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of civil or criminal liability . . . , or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

The reasoning behind this exception is "'"a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest," thereby mitigating the dangers usually associated with the admission of out-of-court statements.'" (*People v. Chhoun* (2021) 11 Cal.5th 1, 47.) To satisfy the exception, the party seeking to admit the statement must demonstrate that (1) the declarant is unavailable

61

to testify; (2) the statement, when made, was against the declarant's penal or other interest; and (3) the statement is sufficiently "'"'reliable"'"' or trustworthy to warrant admission despite its hearsay character.  (*Ibid.*)

In order to qualify under the exception, the statement must be specifically disserving to the declarant's penal interests. (*People v. Gallardo* (2017) 18 Cal.App.5th 51, 70.)  "Evidence Code section 1230 does not authorize the admission of 'those portions of a third party's confession that are self-serving or otherwise appear to shift responsibility to others.'  [Citation.] Nor 'does [the statute] . . . allow admission of non-self-inculpatory statements . . . made within a broader narrative that is generally self-inculpatory.'"  (*Id.* at p. 71.)  The "exception does not apply 'to collateral assertions within declarations against penal interest.' [Citation.]  For example, a hearsay statement '"which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others) does not meet the test of trustworthiness and is thus inadmissible."'" (*People v. Almeda* (2018) 19 Cal.App.5th 346, 364.)

However, this does not exclude all statements that inculpate a nondeclarant.  The exception permits the "admission of those portions of a confession that, though not independently disserving of the declarant's penal interests, also are not merely 'self-serving,' but 'inextricably tied to and part of a specific statement against penal interest.'" (*People v. Grimes* (2016) 1 Cal.5th 698, 715 (*Grimes*).)

Evidence Code section 1230 requires a threshold determination of trustworthiness.  (*People v. Cudjo* (1993) 6 Cal.4th 585, 607.)  "To determine whether the declaration passes the required threshold of trustworthiness, a trial court 'may take

into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.'" (*Ibid.*) California courts have "recognized that the trustworthiness of such declarations is limited and that the hearsay exception should not apply to collateral assertions within declarations against penal interest." (*People v. Campa* (1984) 36 Cal.3d 870, 882.) Keer cites *Grimes, supra*, 1 Cal.5th at page 713 for the proposition that "those portions of a confession inculpating others are not as inherently trustworthy as those portions that are actually disserving to the declarant's interests." Thus, "statements by a nontestifying codefendant that implicate the defendant, even by name, may be admissible if they are disserving to the codefendant's interest and are not exculpatory, self-serving, or collateral." (*People v. Almeda, supra*, 19 Cal.App.5th at p. 364.)

A court's decision to admit or exclude evidence is reviewed for abuse of discretion. (*People v. Ledesma* (2006) 39 Cal.4th 641, 705.)

### C.    *Analysis*

Keer argues Trevizu was in custody after having been arrested and understood the arrest pertained to the murder of Avalos. Keer contends the overall tenor of Trevizu's remarks was blame-shifting in nature, as he repeatedly painted himself as an unwitting, minor player in a larger plan, suggesting it was Keer who was calling the shots. Thus, Keer argues, assuming Evidence Code section 1230 applied to Trevizu's remarks, the provision merely permitted the jury to hear Trevizu's statements inculpating himself. Trevizu's statement that Keer was the shot caller was not supported as there was no evidence Keer conveyed

63

this directly to Trevizu.  Keer thus argues the blame-shifting remarks were not trustworthy and were not covered by any exception to the hearsay rule, therefore it was error to admit them.

We review the elements of the declaration-against-interest exception and conclude the trial court did not err in admitting the statements in question.

        **1.** *Unavailable to testify*

Keer does not challenge the first required element of the declaration against interest exception—that Trevizu was unavailable to testify.  Thus, we do not address this element.

        **2.** *Statement, when made, was against the declarant's penal interest*

Second, it is required that the statement, when made, was against Trevizu's penal interest.  Trevizu admitted he drove to the scene of the killing; that his brother was the shooter; and to the motive of the shooting, stating, "the fools that were staying there [on 87th], snitched on my homie, for him to get life." Trevizu then admitted he and others were doing a favor for his "homie," whom Trevizu describes as "a [B]lack guy."  Trevizu states, "They were doing him a paro.  I was just driving."[22]  He admitted there were five individuals involved in the conspiracy to murder Avalos.  Trevizu later named the "black guy" as "Oso" (Keer), from "Cuarentas."  Trevizu explained in detail, "I was the driver, the paisa was a driver, my girl, she was in my car to getaway.  Then it was my brother and some other . . . the homie from the hood.  Those two were the shooters."  The *Perkins* agent asked, "Yeah but where was Oso?"  To which Trevizu responded,

---

[22]     Paro is Spanish for "favor."

"Oso's the one that told us to go." The *Perkins* agent later asked Trevizu, "You knew what you signed up for, right?" Trevizu responded, "Yeah."

Trevizu's statements as a whole implicated both Keer and Cruz, showing they were all part of a conspiracy with each other, and had acted in concert with each other, to shoot Avalos in retaliation for snitching. Thus, the statement "specifically disserved his penal interest in several respects." (*People v. Cortez* (2016) 63 Cal.4th 101, 127 (*Cortez*).) By identifying other individuals involved in the crime, Trevizu was increasing the likelihood of being associated with the crime. (*Ibid.*) Being linked to these individuals, and admitting to being a part of the conspiracy to commit the murder of Avalos, specifically disserved Trevizu's penal interest. (*Ibid.;* see also *People v. Cervantes* (2004) 118 Cal.App.4th 162, 176 [statement that defendant acted in concert with declarant incriminated declarant and was thus "disserving to the interests of the declarant"], overruled in part on other grounds in *Cortez, supra*, 64 Cal.4th at p. 125, fn. 5.)

Trevizu's statements were neither exculpatory nor self-serving. He admitted to being the driver, and that he knew what he signed up for. Trevizu never attempted to shift blame for his role in the shooting.

**3.** *Statement sufficiently reliable or trustworthy to warrant admission despite its hearsay character*

The rationale behind Evidence Code section 1230 is "'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements." (*Grimes, supra*, 1 Cal.5th at p. 711.) In determining whether a

65

statement is sufficiently trustworthy under this exception, "'"[t]he trial court must look to the totality of the circumstances in which the statement was made."'" (*People v. Smith* (2017) 10 Cal.App.5th 297, 303.)

As set forth above, Trevizu's statements were against his penal interest, which gives reasonable assurance of the veracity of his statements. (*Grimes, supra*, 1 Cal.5th at p. 711.) Trevizu was open with the individual he believed to be a fellow inmate, telling him the details of the day and even going so far as to implicate his girlfriend, stating, "I don't give a fuck about me, dawg, but my girl was there that day too. That's why it's [inaudible] you know?" Trevizu later admitted, "I had her waiting for me. I had her waiting for me on 89th." He appeared to believe he was talking to a fellow inmate when he said, "They're—they're not going to find out it's my girl. They're not." The *Perkins* agent warned Trevizu about talking to a detective, stating, "he could be fishing," to which Trevizu responded, "That's why . . . I'm going to tell him I don't know shit. I plea the 5th. That's it."

Trevizu's statements reveal he believed he was speaking in confidence to a fellow inmate. He did not make any of the statements to "improve his situation with police." (*Cortez, supra*, 63 Cal.4th at p. 128.) "Declarations against penal interest are received notwithstanding that they were spoken in confidence in the expectation they would not be repeated to the authorities. [Citations.] Indeed, that makes such declarations more trustworthy." (*People v. Valdez* (2012) 55 Cal.4th 82, 144.) Trevizu did not attempt to shift blame for his role, and his statements connected him to the crime. His statements were soundly against his interest, as they implicated him as a player

66

in the conspiracy to kill Avalos.  (*Cortez, supra*, at p. 128.)  Under the circumstances, the trial court did not err in finding Trevizu's statements, including his statements implicating Keer, met the requirement of trustworthiness.

### 4. *Conclusion*

The elements of the hearsay exception found in Evidence Code section 1230 were met.  We therefore conclude the trial court did not abuse its discretion in admitting the statements Trevizu made during the *Perkins* operation.

## VI.   Complaints against officers involved—*Pitchess* material

### A.    *Relevant background*

On October 26, 2022, Keer filed a motion for a new trial, arguing among other things the prosecution committed misconduct by withholding exculpatory evidence regarding "dishonesty and other complaints" about Detective Fernandez and other officers until after the jury returned its verdict.  Keer asserted the disclosed material consisted of "four complaints of dishonesty for Detective Fernandez[,] all predating the trial and case filing, six complaints for his partner at the time of this incident, Jennifer Carson [who did not testify but responded along with Detective Fernandez to the first shooting of Avalos], five complaints for Detective Michael Levant [who did not testify but participated in the interrogations of both Trevizu and Ortega] and a handful of complaints for other testifying officers in this case."  The failure of the prosecution to disclose this information before trial, Keer argued, violated Keer's right to due process and warranted granting a new trial.

The motion arose from an e-mail sent by the prosecution to the defense on February 23, 2022, passing along a notice from

LAPD that the personnel files of several officers could contain material leading to impeachment or exculpatory information, and the subsequent disclosure of documents produced by a *Pitchess* motion after the e-mail was received by the defense. Declarations attached to Keer's motion detailed interviews with two individuals who had made allegations against Detective Fernandez.

The prosecution opposed the new trial motion, arguing the newly discovered evidence was neither material nor was it probable that it would render a different result. The prosecution argued the complaints against the officers were unsubstantiated, mischaracterized by the defense, and had no bearing on the evidence of guilt presented. Further, defense counsel could have brought a *Pitchess* motion before trial if Detective Fernandez's credibility was so central to the defense.

The motion was argued on November 20, 2022. Defense counsel suggested the prosecution was negligent in failing to turn over the records earlier, as "all of the complaints that were revealed on the investigating officer, Fernandez, and his partner, Jennifer Carson, were from well before this trial." Counsel noted during the summer of 2021, before trial, the prosecution had provided a disclosure of Detective Fernandez's officer-involved shooting, and stated "that disclosure lulled us defense counsel into a false sense of fairness that we had received all of the information on Isaac Fernandez." Keer's counsel also noted there were complaints against Detective Fernandez for his racial bias and his use of crass language, which were particularly concerning as Keer was the only Black defendant.

The prosecution argued the disclosures were immaterial. Further, the prosecutor argued defense counsel was unreasonable

in suggesting the prosecution purposely withheld the material about the officers.

After hearing argument, the court denied the motion for new trial, explaining its reasoning in detail.  The court had presided over the trial and was familiar with the evidence in the case.  In terms of challenges to the integrity of counsel "going both ways," the court noted it had not "been established that there's been any lack of candor or anything inappropriate done by any of the counsel on this case."  The court focused on "whether the quote, unquote 'newly discovered evidence' is such that it would render a different verdict[, whether] a different verdict [would] be reasonably probable on a new trial, and that's the key requirement that must be established."  The prosecution did a good job of pointing out the evidence that came in "really didn't have anything to do with Detective Fernandez."  The court stated even assuming the evidence regarding the officers would have been admissible, "you'd have to look at what evidence did we have in this case.  The People put on a very strong case . . . ."  The court then went over some of the evidence, including the evidence from the *Perkins* operation as well as testimony from Sanchez, jail phone calls, social media, cell phone evidence, and surveillance video.  The court concluded a different verdict was not reasonably probable based on the alleged new evidence.  The court emphasized there was no misconduct on the part of any attorney because "some of this came about as a result of there being a new district attorney elected for L.A. County and new directives put out through the deputy D.A.s to turn over everything, for lack of a better phrase."

**B.** *Applicable law and standard of review*

A trial court may grant a defendant's motion for new trial "[w]hen new evidence is discovered material to the defendant, and which he could not, with reasonable diligence, have discovered and produced at the trial." (§ 1181, subd. (8).) "'In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: "'1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits.'"'" (*People v. Howard* (2010) 51 Cal.4th 15, 43.) The defendant bears the burden of proof. (*People v. McDaniel* (1976) 16 Cal.3d 156, 178).

"'"'"The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears."'"'" (*People v. Howard, supra*, 51 Cal.4th 15, 42–43).

**C.** *Analysis*

Declarations attached to the defense's motion for new trial included interviews with two individuals who made allegations against Detective Fernandez.[23] One individual claimed over a

---

[23] The prosecution points out Keer's motion failed to attach an affidavit from his investigator or from any of the individuals interviewed and therefore failed to meet the requirements of section 1181, subdivision 8. Thus, the motion could have been properly denied on this ground. (*People v. Beeler* (1995) 9 Cal.4th 953, 1005, abrogation on other grounds recognized in *People v. Edwards* (2013) 57 Cal.4th 658, 704–706.) Keer claims this

70

period of a few years (2015–2017) he was constantly stopped in his vehicle by Officer Fernandez, on many occasions without any specific cause or reason. Officers also searched his car without giving him a valid reason. On one occasion, the individual was sitting in his vehicle when Officer Fernandez stopped the patrol car directly next to his car and shined the police light into his car, temporarily blinding him. He was ordered out of his vehicle and when he complied, he was physically searched by Officer Fernandez. During the patdown search, Officer Fernandez became agitated, handcuffed him, and arrested him for resisting arrest.

A second individual alleged he had been stopped and searched by Officer Fernandez in 2014 with no probable cause. Approximately 15 minutes after the initial stop, he was walking to his car in the vicinity and was stopped a second time by Officer Fernandez. He was told he was observed selling narcotics, although he was not selling narcotics and had no narcotics or paraphernalia on his person. He was detained for supposedly selling narcotics, but was later released when there was no evidence of narcotics. The individual claimed Officer Fernandez also searched his car without permission and lied in the police report indicating he had observed the individual selling narcotics.

There were other complaints against Officer Fernandez for racial bias and using crass language. Officer Fernandez made racist comments in his interviews of Hispanic defendants "about how they are, you know, better when they commit gang crimes than the Blacks are, who just shoot up everything." In the

argument was forfeited on the ground the prosecution did not raise it at trial. (*People v. Tillman* (2000) 22 Cal.4th 300, 302–303.) Therefore, we address the merits of the new trial motion.

71

questioning of Ortega, Detective Fernandez told Ortega he believed Ortega would not do drive-by shootings and did everything "up and . . . up and, you know, personal." Detective Fernandez stated, "Blacks are more out of control, you know, whatever." In the interview of Trevizu, the detective had made similar comments, stating "there's certain rules that go with that number 13. Not like black gangs. You know, [B]lack gangs is you know?"

Defense counsel argued they should have been permitted to use this evidence against Detective Fernandez, to show Detective Fernandez "did not properly do his investigation and was biased." Keer argues Detective Fernandez played a central role in constructing the case against Keer, taking the stand on eight different days, for more than 400 pages of testimony. Keer argues Detective Fernandez was essentially the narrator of the entire case. The detective was a conduit for presenting to the jury everything including the surveillance footage to the social media records to the interrogation of Ortega and the *Perkins* operation. Thus, defendants argue, the new trial motion was not only about Detective Fernandez's credibility but the fundamental validity of a largely circumstantial case against Keer. Keer argues the jury would have been more inclined to view the case with skepticism had they known the detective was accused of making racist remarks and abusing legal processes in other cases.

Keer argues the detective's views on race are particularly significant because of what the detective appeared to believe about Black versus Latino gang members. The detective represented that Black members killed in an indiscriminate manner, whereas Latinos did not. Thus, Keer argues, the

prosecution's theory of how the murder played out was framed by a man who was operating on the basis of these crude stereotypes.

Considering the evidence as a whole in this matter, we find the trial court did not abuse its discretion in determining the defense failed to show a reasonable probability of a different result.  "As a general rule, 'evidence which merely impeaches a witness is not significant enough to make a different result probable . . . .'" (*People v. Green* (1982) 130 Cal.App.3d 1, 11.) Although Detective Fernandez testified at trial, the court recognized "the evidence that came in, it really didn't have anything to do with Detective Fernandez."  The court expressed doubt the statements of the individuals interviewed would have even been admissible.  However, even assuming they were admissible, "the People put on a very strong case . . . that was based upon evidence that really was not deliberate via Detective Fernandez; for example the *Perkins* operation."  The *Perkins* evidence came in via audio and video, where Trevizu "really laid out what happened during the course of the [Avalos] murder."  In addition, the court pointed out there was evidence from Sanchez as to the "relationship between Mr. Keer and the other individuals involved; again, laying out a motive and strategy for committing the offense."  The jail phone calls, social media, surveillance video, and cell phone evidence all connected the defendants to the murders, and none of it came in via Detective Fernandez.  None of this evidence was affected by the credibility of Detective Fernandez.  In short, the new evidence did not call into question any of the key evidence the court referred to in its ruling.  (*People v. Hall* (2010) 187 Cal.App.4th 282, 298 [trial court properly denied new trial motion where new evidence was not directed at the strongest evidence against the defendant.].)

73

Under these circumstances, defendants have failed to show an abuse of discretion in the trial court's decision to deny the new trial motion.

## VII. Independent *Pitchess* review

All three defendants have requested this court independently review the trial court's *Pitchess* ruling. The People do not object. When requested by an appellant, an appellate court may review the transcript of the trial court's in-camera *Pitchess* hearing to determine if the trial court disclosed all relevant complaints. (*People v. Mooc* (2001) 26 Cal.4th 1216, 1229–1232.)

Keer's *Pitchess* motion sought evidence of any accusations the following officers committed misconduct: Michael Levant, Robert Martinez, Andres Sandoval, Eddie Amaral, Herbert Ybannez, Jennifer Carson, and Isaac Fernandez. Evidence of misconduct sought included accusations of excessive force, bias, dishonesty, coercive conduct or acts constituting a violation of the statutory or constitutional rights of others.

On September 7 and 8, 2022, Honorable Hector G. Gutierrez conducted proceedings in camera concerning the subject *Pitchess* motion. A city attorney and custodian of records for LAPD were present. The court noted it reviewed every file for each officer named and did not limit its review to the last five years.

As to each officer, the court stated on the record the general content of each complaint, then stated its reasons for ordering the complaint to be disclosed or not. As to the complaints that were ordered disclosed, the court further provided contact information for each complaining party and available witnesses, if any. The court provided a thorough summary of the records provided by

74

the custodian of records, detailing the contents of each complaint regardless of remoteness in time.

"Trial courts are granted wide discretion when ruling on motions to discover police officer personnel records." (*People v. Samayoa* (1997) 15 Cal.4th 795, 827.) We have reviewed the sealed in-camera *Pitchess* hearing transcript. Although the personnel records are not before us, the trial court set forth a sufficient summary of each record provided for each named officer for us to determine the nondisclosed records are irrelevant to the defendants' request. No abuse of the trial court's discretion occurred.

## VIII. Parole supervision restitution fines

Keer and Chacon argue the parole supervision restitution fines described in the minute order and abstract of judgment as having been imposed under section 1202.45 must be deleted because the fines were not actually imposed and are unauthorized as to both Keer and Chacon since both were sentenced to life without parole.

The People agree the trial court should not have imposed the challenged fines and respectfully request the court modify the judgment by striking them. (See *People v. Oganesyan* (1999) 70 Cal.App.4th 1178, 1181–1182, 1185 ["Section 1202.45 indicates that it is applicable to a 'person . . . whose sentence includes a period of parole.'"].) As there is no dispute the fines should be stricken, we order them stricken.

## IX. Chacon—presentence custody credit

Appellant Chacon contends he is entitled to an additional day of actual presentence custody credit for a total of 1,122 days. The People concede he is correct.

75

Although Chacon's counsel did not object at trial, forfeiture of sentencing only occurs when the alleged error involved an exercise of discretion.  Because the calculation of credits is purely mathematical, his failure to object at trial does not preclude this court from correcting the error.  (See *People v. Aguirre* (1997) 56 Cal.App.4th 1135, 1139.)

We modify the judgment to clarify the amount of credits awarded and order the abstract of judgment corrected, as both Chacon and the People request.

## DISPOSITION

The section 1202.45 fines imposed against Keer and Chacon are stricken.  The judgment is modified to reflect Chacon is to receive an award of 1,122 days of actual custody credit.  The judgment is otherwise affirmed.


CHAVEZ, J.

We concur:


LUI, P. J.


RICHARDSON, J.

76